## CRANDALL et al. v. WOODS et al.

Possession of public land gives the right to the use of water flowing through it for natural wants, but does not confer the right to divert it, and prevent its running upon the adjoining land of another who has taken the same up subsequently, but before the attempt to change the course of the water.

Possession of public land carries with it the privileges and incidents of ownership against every one but the government, subject only to rights antecedently acquired.

As between two locators of public land, the rule, *qui prior est in tempore, potior est in jure*, must always apply.

Rights to the use of water become fixed after five years' adverse enjoyment of the same.

Appeal from the District Court of the Fourteenth Judicial District, County of Nevada.

This was an action for damages and a perpetual injunction on the part of the Union Water Company against Woods and wife, and Andrew Jamieson, for the diversion of water claimed by plaintiff. The defendants Woods disclaimed, while the defendant Jamieson justified, his right to the water. The facts were as follows : In the year 1850, the defendants Woods were in the possession of a tract of government land that contained several springs of running water, which, after running a short distance through their natural outlets, united and formed one stream, which, in the year 1851, ran through a small tract of land adjoining, and was used by the owners thereof for irrigation and other natural purposes. In June, 1852, Woods sold out his right to the springs to the plaintiff, and became a member of said company, who at once constructed a system of water-works whereby the town of Grass Valley has been supplied by water ever since the year 1852. The defendant Jamieson connected himself by various conveyances with the title that the possessors in 1851 had to the ranch adjoining the Woods tract, and claimed and exercised the right in 1856 of using the water of plaintiffs for his natural uses. The case was tried before a jury, whom the defendant Jamieson asked the Court to instruct as follows, which being refused, an exception was duly taken : " If the jury believe, from the evidence, that the defendant Andrew Jamieson, or those under whom he holds, located the ranch or piece or parcel of ground prior to the claim set up by the plaintiffs to the waters of the springs in question, and that the water of said springs, by its natural flow, found its way into defendant Jamieson's said ranch, then that said Jamieson was entitled to the reasonable use of said water, and to have the same flow through his ranch for agricultural and farming purposes, as against the plaintiffs, subsequently diverting the same for culinary and domestic purposes." The jury returned a verdict in

favor of plaintiffs, on which judgment was rendered. Defendants appealed.

*McConnell & Steuart* for Appellants.

There is but a single point presented by the bill of exceptions in this case, for the consideration of the Court. That point is, whether the location and appropriation of a portion of the public land for such purposes as the locator may deem proper to put it, carries with it a right to the use of such water-courses as naturally flow through it, as against persons subsequently appropriating and using the water of such water-courses.

In the case at bar, the ranch called the "Jamieson," or "Bennett" ranch was "taken up," and enclosed in the month of February, 1851, and the plaintiff first appropriated the waters of the several springs (of which mention is made in the pleadings and bill of exceptions,) in June, A. D. 1852.

As the question of priority of location by the defendants appears clearly from the record, and in fact is not controverted, the whole question may be simplified by stating it in the following form:

Does a person taking possession of a part of the public domain, acquire thereby a right to the reasonable use of such natural water-courses as have, from time immemorial, flowed through such land?

Of this proposition, we maintain the affirmative.

We say first that the word "land" embraces, "*ex vi termini,*" all streams of water flowing through or upon it, and that possession of land, however obtained, carries with it a usufructuary interest in the waters of such streams as flow through it, as long as such possession continues.

The word "land," legally imports not only the superficial soil, but everything either above or below the surface. 2 Black. Com., 17, 18; 1 Hilliard's Real Property, 51; Coke on Littleton, 4 a; 3 Kent's Com., 401.

It includes the beds and banks of all streams or pools of water (*stagna*) contained within it; hence it is said that a *præcipe* in a real action or action of ejectment does not lie for a running stream or even a standing pool of water, *eo nomine,* but, for so much land covered with water (*terra aqua coöperta.*) Coke on Littleton, 4 a; 2 Black. Com., 18; Angell on Water-Courses, §§ 5 to 9, inclusive.

Again: a water-course is said to consist of "bed, banks and water." Angell on Water-Courses, § 4, *passim*; Gavitt's Adm'r *v.* Chambers; 3 Ohio R., 495; Starr *v.* Child.

So much for the hypothesis that mere naked possession of land includes a right to the use of flowing waters; but is there any reason why we may not regard every individual in possession of public land in the light of a grantee of the government, and in

that character permitted to shield himself behind the government's title against the acts of all subsequent occupants.

Such has been the opinion of this Court, frequently expressed, in reference to the rights claimed by miners and persons appropriating water for mining objects.  Irwin v. Phillips, Jan. Term, 1855; Priest v. Union Water Co.; Eddy and other v. Simpson and others, 3 Cal. Rep., 249 ; Conger et al. v. Weaver et al., October Term, 1856.

Now nothing is better settled, than that a grant of land from government, to a citizen, carries with it, as an appurtenance, a right to the natural, and (to some extent) the artificial use of all streams flowing through such land, even though they be navigable ; though in the latter case the grantee is subject to those public rights vested in the government for the benefit of the community, and which cannot be aliened.  Angell on Water-Courses, §§ 5 to 10, inclusive; 14 Mass. Rep., 149; Middleton v. Pritchard, 3 Scammon, Ill., Rep., 520; Brown v. Kennedy, 5 H. & Johns., (Ms.,) 195; 8 Watts (Penn.) Rep., 470; 5 Wend. Rep., 423; 13 ib., 355; 1 ib., 255; People v. Platt, 17 John. Rep., 195; 2 Hill (N. Y.) Rep., 620; Angell on Water-Courses, § 14; 3 Smede & Marshall, 366; Gavitt's Adm'r v. Chambers, 3 Ohio Rep., 495.

*A. B. Dibble* for Respondents.

The first question involved in the alleged errors, is this:·  "Does the mere naked location of land in the mineral domain of the State, carry with it the right to all the waters naturally flowing through it at the time of location ?"

To apply the doctrine of riparian rights to the settlement of public lands by individuals, is the object and gist of the last instruction.

It cannot be denied, that under the Common Law, (having its origin under the civil,) proprietorship of land carried with it, the water naturally flowing upon the land.  The maxim, *cujus est solum ejus est usque ad cœlum*, is too well accredited to be denied.  That a grant of the land conveys all that is upon it, as timber, water, etc.; and under the common law, it has of course been held, that the right to a water-course, is a part of the freehold.  " That no action will lie to recover possession of a watercourse by that name, either by estimating the capacity of the water, as for so many cubical yards, or by superficial measure for twenty acres of water, etc.   The action must be for the land at the bottom, calling it twenty acres of land covered by water. To give execution of that which is so wandering and fugitive, as running water, is indeed impracticable.  Riparian proprietorship is grounded upon grants, having been executed from time immemorial, in the absence of a grant by prescription of many years, raising the presumption of grant."   Nor is it denied, that

Crandall v. Woods.

all of the principles of riparian proprietorship made applicable to agricultural and farming countries, had their origin in the peculiarities of climate and country, and in the necessities and wants of the people. The principles of law, as well riparian as others, have received their form, and exist from the necessities of bodies of men, so as to measure out to them that protection, which, under the circumstances by which they were surrounded, seemed to be just and right.

If principles of law are to be determined by any other rule than that of the necessities of the people, then the application of the doctrine, that water must flow in its natural channel without diminution, alteration, or corruption, must be made as well to the mineral domain of this State, as to the agricultural domain of the State of Ohio. As asserted by Kent, (Vide Com., vol. 3, pp. 537–8).

"No proprietor has a right to use the water to the prejudice of other proprietors, above or below him, unless he has a prior right to divert it, or a title to some exclusive enjoyment. He has no property in the water itself, but a simple usufruct while it passes along. Though he may use the water while it runs over his land as an incident to his land, he cannot unreasonably detain it, or give it another direction; and he must return it to its ordinary channel when it leaves his estate. Without the consent of the adjoining proprietors, he cannot divert or diminish the quantity of water that would otherwise descend to the proprietors below, nor throw the water back upon the proprietors above, without a grant, or an uninterrupted enjoyment of twenty years, which is evidence of it. This is the clear and general doctrine on the subject, and all the difficulty that arises, consists in the application."

The proposition asserted by the appellants, in the instruction above, is this: that the location of the "Bennett Ranch" vested the right in the locator, or possessor, to have the water flow over it. They do not contend that they ever subjected the water to their control, or appropriated it, but that it was at all times liable to be so subjected and appropriated, because of their location of the land, and that only.

On the trial of the case, the defendants did not contend that they had appropriated, in fact, the waters, until defendant Jamieson diverted them in the fall of 1856, after plaintiffs had possessed and fully controlled them over four years; and under the first instruction of the Court, the jury found that plaintiffs were first to locate the water-right and appropriate the waters.

If the naked location of the ranch, does of itself vest a right to the water, then plaintiffs are *ab initio* trespassers, and for four years' diversion of the water, are liable to defendants. If such be the case, the water ceases to be subject to appropriation, and he who finds it running, without value to any one, may not di-

vert it, though by so doing, public and private gain, and advantage, would be never so great.

It is not claimed by respondents, when an individual locates land in the mineral domain, and actually renders the water naturally flowing upon and over it, subject to his direction, or manifests and publishes an intention so to do, followed up by acts and works, as required in other cases of appropriation of water, (provided his be the first location thereof,) that he cannot hold the same against persons, subsequently seeking to divert it. Such position is in accordance with the principle of law laid down by our Supreme Court, in the case of Tartar *v.* The Spring Creek Water and Mining Co., October Term, 1855. "The right to the use of water on the public lands, depends upon the principle of prior occupancy."

And such was the language used by the District Court in this case, and which is here questioned by appellants as error—not only may the locator of land possess himself as other parties may, of the first user of the water flowing on his lands, but he may, (as in hundreds of cases he does,) construct his ditch, and from other ravines and streams bring to his use the waters thereof. His necessities require for him the use of water, and he seeks it where others have not appropriated it. Being, in fact, the first appropriator, is it a question as to his right?

· "The rule that a water-course must be allowed to flow in its natural channel;" "that the owner of land on the banks of a water-course, owns to the middle of the stream, and has the right in virtue of his proprietorship, to the use of the water in its pure and natural condition;" "that the diversion of a water-course could only be complained of by riparian owners, (assuming the location of mineral lands to be such,) who were deprived of the use, or those claiming under them," cannot apply to a case where the water-course is on the public mineral lands; that the doctrine seemingly applicable, is this: that water may be diverted from a water-course, or corrupted as it flows therein; that priority of appropriation, or manifested intention to appropriate, followed up with suitable acts, evincing such intention, shall give priority of right to the use of water in all cases; that where a right to the use of water has once vested, it may afterwards be divested by fact, establishing abandonment, or by lapse of time. Respondents further refer to the following cases: Eddy *v.* Simpson, 3 Cal. R., p. 249; Irwin *v.* Phillips, January Term, 1855; Oile *v.* Newman, October Term, 1855; Kelley *v.* Natoma Water Co., January Term, 1856.

MURRAY, C. J., delivered the opinion of the Court—BURNETT, J., concurring.

The only question involved in this case is, whether a party who locates upon and appropriates public lands belonging to the

United States, is entitled to the use of streams and water-courses naturally flowing through such lands, as against persons subsequently appropriating and using the waters of said streams. By the common law, the proprietor of lands upon the banks of a water-course owns to the middle of the stream, and the proprietor of the lands through which the stream flows is held to be the owner of the bed of the stream, and entitled to the use of the water which flows over his land.

The property in the water, by reason of riparian ownership, is in the nature of a usufruct, and consists in general not so much in the fluid as in the advantage of its impetus. This, however, must depend in a great measure upon the natural as well as the artificial wants of each particular country. The rule is well settled that water flows in its natural channels, and should be permitted thus to flow, so that all through whose lands it passes may enjoy the privilege of using it. A riparian proprietor, while he has the undoubted right to use the water flowing over his land, must so use it as to do the least possible harm to other riparian proprietors.

The uses to which water may be appropriated are: 1st, To supply natural wants, such as to quench thirst, to water cattle, for household or culinary purposes, and, in some countries, for the purposes of irrigation. These must be first supplied, before the water can be applied to the satisfaction of artificial wants, such as mills, manufactories, and the like, which are not indispensable to man's existence. Water is regarded as an incident to the soil, the use of which passes with the ownership thereof. As a general rule, a property in water cannot be acquired by appropriation, but only by grant or prescription.

Having thus stated the fundamental principles upon which this right is founded, it is evident that the only difficulty in this case arises, first, from the fact that the defendant is not the owner in fee of the land, but that the title to it is in the government of the United States; and second, the necessity of laying down some rule consistent with our former decisions, and the policy of the State, which has been to protect mining interests and improvements as far as possible.

In Irwin v. Phillips, which is the leading case upon the subject of the appropriation of water, it was admitted that the lands upon which the mining-claims were situated, and through which the water ditch was located, were government lands, and that the mining-claims were located after the water had been appropriated.

In delivering the opinion of the Court, Mr. Justice Heydenfeldt remarks: "It is insisted by the appellants that, in this case, the common law doctrine must be invoked, which prescribes that a water-course must be allowed to flow in its natural channel. But upon an examination of the authorities which

support that doctrine, it will be found to rest upon the fact of the individual rights of landed proprietors upon the stream, the principle being, both at the civil and common law, that the owner of lands on the banks of a water-course owns to the middle of the stream, and has the right, in virtue of his proprietorship, to the use of the water in its pure and natural condition. In this case, the lands are the property either of the State or of the United States, and it is not necessary to decide to which they belong for the purposes of this case. It is certain that, .at the common law, the diversion of water-courses could only be complained of by riparian owners, who were deprived of the use, or those claiming directly under them. Can the appellants assert their present claim as tenants-at-will? To solve this question it must be kept in mind that their tenancy is of their own creation, their tenements of their own selection, and subsequent, in point of time, to the diversion of the stream. They had the right to mine where they pleased throughout an extensive region, and they selected the bank of a stream from which the water had been already turned for the purpose of supplying the mines at another point."

Since this decision, a special property has been recognized in water, not in the sense in which the word property is ordinarily used; but the Courts have held, that a right to water as a usufruct, may be acquired by appropriation, as against a subsequent appropriator, who shows no title to the soil; and that by the appropriation of water, and the construction of a canal, the party acquires an easement or franchise, which he may enjoy and protect. If this is an innovation upon the old rules of law upon this subject, it is such a one as the peculiar circumstances of the country, and the immense importance of our mining interest, will justify.

In the case of Starr v. Child, 20 Wend., Judge Bronson, in speaking of the obligations of American Courts to follow the rules of common law, as laid down by the Courts of England, uses the following strong language:

"Although the ebb and flow of the tide furnishes an imperfect standard for determining what rivers are navigable, it nevertheless approximates to the truth, and may answer very well in the island of Great Britain, for which the rule was made. But such a standard is quite wide of the mark when applied to the great fresh-water rivers of this continent, and would never have been thought of here if we had not found the rule ready made to our hands. Now, I think no doctrine better settled, than that such portions of the law of England as are not adapted to our condition, form no part of the law of this State. This exception includes not only such laws as are inconsistent with the spirit of our institutions, but such as are framed with special reference to the physicial condition of a country differing widely from our

own. It is contrary to the spirit of the common law itself, to apply a rule founded on a particular reason, to a case where that reason utterly fails. *Cessante ratione legis, cessat ipsa lex.*"

To proceed, however, with the case before us. If the rule laid down in Irwin *v.* Phillips, is correct as to the location of mining-claims and water-ditches, for mining purposes, and *priority* is to determine the rights of the respective parties, it is difficult to see why the rule should not apply to all other cases where land or water had been appropriated. The simple question was, that as between persons appropriating the same land, or land and water both, as the case might be, that the subsequent appropriator takes, subject to the rights of the former.

But an appropriation of land carries with it the water on the land, or a usufruct in the water, for in such cases the party does not appropriate the water, but the land covered with water. If the owners of the mining-claim, in the case of Irwin *v.* Phillips, had first located along the bed of the stream, they would have been entitled, as riparian proprietors, to the free and uninterrupted use of the water, without any other or direct act of appropriation of the water, as contra-distinguished from the soil. If such is the case, why would not the defendant, who has appropriated land over which a natural stream flowed, be held to have appropriated the water of such stream, as an incident to the soil, as against those who subsequently attempt to divert it from its natural channels for their own purposes.

One who locates upon public lands with a view of appropriating them to his own use, becomes the absolute owner thereof as against every one but the government, and is entitled to all the privileges and incidents which appertain to the soil, subject to the single exception of rights antecedently acquired. He may admit that he is not the owner in fee, but his possession will be sufficient to protect him as against trespassers. If he admits, however, that he is not the owner of the soil, and that the fact is established that he acquired his rights subsequent to those of others, then, as both rest alike for their foundation upon appropriation, the subsequent locator must take subject to the rights of the former, and the rule, *qui prior est in tempore, potior est in jure,* must apply.

Let us examine the effect of such a rule for a moment, and see if the consequences which the respondent predicts, viz.: the destruction of the use and value of ditch property in the mines, will necessarily flow from it. A has located mining-claims along the bed of a stream, before any water-ditch or flume has been constructed; will any one doubt that he should have the free use of the water, as against subsequent locators of either mining-claims or canals? Or, suppose he had located a farm, and the water passing through his land was necessary for the purposes of irrigation, is not this purpose just as legitimate as using the water for mining? It may or may not be equally

as profitable, but irrigation for agricultural purposes is sometimes necessary to supply natural wants, while gold is not a natural, but an artificial want, or a mere stimulant to trade and commerce.

It is understood, that the location of land carries with it all the incidents belonging to the soil. Those who construct water-ditches will do so with reference to the appropriations of the public domain that have been previously made, and the rights that have been already acquired, with a full knowledge of their own rights as against subsequent locators.

In the case before us, the plaintiffs are not the proprietors of a ditch constructed for mining purposes, (although we have endeavored to show that this would make no difference.) They claim that they purchased the privilege of the water from one Woods, and conducted the same by means of pipes, etc., to the town of Grass Valley, for the use of the inhabitants. The water in dispute had its source in natural springs rising upon the ranch or farm of Woods, who located the land in 1850. In 1851, the ranch of the defendant which was contiguous to that of Woods, was located, and the water flowed by natural channels upon it. Woods sold the privilege of diverting the water to the Union Water Co., in 1852. At the time of this sale the rights of the defendants had accrued. Woods had no power of disposition over the water; he could use it for the purpose of supplying the wants of himself and his stock; and if there was sufficient, might, without interfering with the rights of those below him, have used a portion for the purposes of irrigation; but he had no right to divert it from its natural channel, or prevent it from flowing upon the lands of the defendants. Evans v. Merriweather, 3 Scam.; and Arnold v. Foot, 12 Wend.

It does not appear, from the evidence in this case, that the water would have flowed through the town of Grass Valley, or that it was the only water which could be obtained for the purpose of supplying the town; neither does it appear that the amount used by defendant for irrigation was so large as to materially diminish the quantity, or render the supply inadequate to the wants of the inhabitants of the town.

The plaintiffs declare as a company, and count upon their appropriation, and not upon their rights as riparian proprietors. This relieves the case of the question, whether granting the defendant had a right to use the water to supply his natural wants, he could use it for the purpose of irrigating his land.

It is urged by the respondent that they have acquired a right to the use of the stream in question by adverse enjoyment or prescription. To acquire a title in this manner, it is necessary that the enjoyment or prescription should have continued for a period corresponding to the time fixed by the Statutes of Limitations as a bar to an entry on land. The period fixed by our statute

is five years; the plaintiff's possession has continued but four, so that his right has not yet become complete.

Judgment reversed, and cause remanded.