91 Cal.App.2d Supp. 943 (1949)
THE PEOPLE, Respondent,
v.
CORA ELIZABETH STATLEY, Appellant.
California Court of Appeals. 
April 28, 1949.
 T. Ed Scarborough for Appellant.
 Ray L. Chesebro, City Attorney, Donald M. Redwine, Assistant City Attorney, and Walter C. Allen, Deputy City Attorney, for Respondent.
 BISHOP, J.
 [1] Convicted on a charge that she had failed to yield the right of way to a pedestrian in a crosswalk, the defendant contends that the judgment of conviction should be reversed because the trial court failed to give her requested instruction that "under the laws of this State, a married woman is not capable of committing a misdemeanor while acting under threats, command or coercion of her husband." In support of her contention the defendant advances three arguments: (a) the instruction embodies a correct principle of law; (b) it was called for in this case by direct evidence that she was acting under her husband's command; (c) it was made pertinent by the common law presumption that a misdemeanor committed by a married woman in her husband's presence is done under his coercion. We have reached the conclusion that the instruction should have been given. It was a correct statement of the law, and the evidence before the jurors made it applicable. We cannot, however, square the ancient presumption with the facts of modern life. We are not ready to put our stamp of approval on the statement that, when a married woman who is operating a motor vehicle in which her husband is a passenger, neglects to make a boulevard stop, fails to signal before she turns, or commits any other violation of the traffic laws, the probability is that she did so because he made her do so.
 There can be no doubt that the requested instruction is a correct statement of the law, for we find in section 26, Penal [91 Cal.App.2d Supp. 945] Code: "All persons are capable of committing crimes except ...: Seven. Married women (except for felonies) acting under the threats, command, or coercion of their husbands." One of the two exceptions contained in the language of the section was eliminated in People v. Graff (1922), 59 Cal.App. 706, 708 [211 P. 829, 830], by rephrasing the quoted provision to read: "Married women are persons capable of committing all crimes, except misdemeanors committed by them when acting under the threats, command, or coercion of their husbands." It may quite properly be restated, for the purpose of this misdemeanor case, to eliminate all exceptions: "Married women are persons not capable of committing misdemeanors when acting under the threats, command, or coercion of their husbands." It was this principle of law that the defendant desired to have implanted in the minds of the jurors in order that she might have the benefit of it. The possibility that this code provision has become anachronistic does not justify the courts in disregarding it. A legislative enactment is not repealed by time or changed conditions, but only by further legislation. (Palermo v. Stockton Theatres, Inc. (1948), 32 Cal.2d 53, 63 [195 P.2d 1, 7], and cases cited.)
 The testimony which gave pertinency to this instruction came from the lips of defendant's husband. After relating how the automobile which the defendant was driving, and in which he was riding, had stopped, to permit the traffic to clear up in the lane between them and the crosswalk, defendant's husband continued by repeating the words he had addressed to her, "You have got plenty of clearance, take it." She had begun to move forward just before he spoke these words, and following their utterance she drove on and into the crosswalk, causing a pedestrian to jump back.
 We find in this evidence no basis for concluding that the defendant, in driving across the lane of traffic and into the crosswalk, had acted under a threat or under the coercion of her husband, but, had the matter been submitted to the jury, it is possible that it would have been determined that she acted under his command, or at least have entertained a reasonable doubt (see People v. Hardy (1948), 33 Cal.2d 52, 64 [198 P.2d 865]) about the matter. His declaration to her was couched in the form of a command, and while it must be conceded that the jury might have determined that the defendant paid no attention to what her husband was saying, the question was one of fact, and the defendant was entitled [91 Cal.App.2d Supp. 946] to have the case submitted to the jury on her theory of the facts. Of course, the husband's denial that his words "Take it" constituted a command, no more removed the possibility of a command from the case than did his denial that there was a pedestrian in the crosswalk do away with him.
 [2] The defendant contends that the requested instruction was pertinent not only because there was direct evidence of a command but for the further reason that a presumption had arisen that she was acting under the coercion or command of her husband, and she requested, vainly, a further instruction that there was such a presumption. Whether or not such a presumption arises is a question that will be involved in any retrial of this case, and so merits attention. Our determination that there is no such presumption applying in this case is not predicated on any misapprehension about the existence of the presumption at common law. It did exist. It is referred to in O'Donnell v. State (1941), 73 Okl. Cr. 1 [117 P.2d 139, 141], as being: "the rule of the common law that where a crime, with some exceptions, was committed by a married woman conjointly with or in the presence of her husband, prima facie she was not criminally liable, as it was presumed that she acted in obedience to his commands and under his coercion. This doctrine is announced by Blackstone, who says that it is a thousand years old." (See, also, 41 C.J.S. 715-718.)
 Nor are we unaware of the provision of section 4468, Political Code, that "The common law of England, so far as it is not repugnant to or inconsistent with the constitution of the United States, or the constitution or laws of this state, is the rule of decision in all the courts of this state." We interpret State v. Carpenter (1947), 67 Idaho 277, 281 [176 P.2d 919, 921], as holding that a statutory provision identical with our seventh subdivision of section 26, Penal Code, "differs from the common law" with the consequence that the presumption is no longer applicable. We are not satisfied, however, to rest our decision on this case, nor do we find the seventh subdivision of section 26 or any other statutory provision to be so inconsistent with the presumption that by virtue of the inconsistency the presumption is destroyed. We have come to our conclusion--that the presumption, which had served for more than a thousand years, has no application in such a case as ours--because we deem it possible for a common law principle to become inoperative when the conditions which gave rise to it cease to operate, and that that is the situation here.
 In support of our first premise, that a principle of the [91 Cal.App.2d Supp. 947] common law may in time disappear from it, we present passages from two California cases. We quote first from Lux v. Haggin (1886), 69 Cal. 255, 379, 385 [4 P. 919, 10 P. 674, 746, 750], the emphasis being that of the court: "In ascertaining the common law of England, we may and should examine and weigh the reasoning of the decisions, not only of the English courts, but also of the courts of the United States and of the several states, down to the present time. We are not limited to the consideration of the English decisions rendered prior to July 4, 1776. ..."
 "The common law of England may be said to consist of a collection of principles found in the opinions of sages, or deduced from universal and immemorial usage, and receiving progressively the sanction of the courts. ... The best evidence of the common law is found in the decisions of the courts, contained in numerous volumes of reports, and in the treatises and digests of learned men, 'which have been multiplying from the earliest periods of English history down to the present time.' "
 The following statement from Katz v. Walkinshaw (1903), 141 Cal. 116, 122, 123 [70 P. 663, 74 P. 766, 767, 99 Am.St.Rep. 35, 64 L.R.A. 236], is also helpful: "... In Crandall v. Woods, 8 Cal. 143, the court approved the following rule, quoting from the dissenting opinion of Bronson, J., in Starr v. Child, 20 Wend. 159: 'I think no doctrine better settled than that such portions of the law of England as are not adapted to our condition form no part of the law of this state. ... It is contrary to the spirit of the common law itself to apply a rule founded on a particular reason to a case where that reason utterly fails. ..."
 "The true doctrine is, that the common law by its own principles adapts itself to varying conditions, and modifies its own rules so as to serve the ends of justice under the different circumstances, a principle adopted into our code by section 3510 of the Civil Code: 'When the reason of a rule ceases, so should the rule itself.' ... In Beardsley v. Hartford, 50 Conn. 542 [47 Am.Rep. 677], the court says: 'It is a well-settled rule that the law varies with the varying reasons on which it is founded. This is expressed by the maxim (sic): "Cessante ratione, cessat ipsa lex." This means that no law can survive the reasons on which it is founded. It needs no statute to change it; it abrogates itself. If the reasons on which a law rests are overborne by opposing reasons, which, in the progress [91 Cal.App.2d Supp. 948] of society, gain controlling force, the old law, though still good as an abstract principle, and good in its application to some circumstances, must cease to apply or to be a controlling principle to the new circumstances.' "
 We content ourselves with merely citing two additional illustrative California authorities: Mushet v. Department of Public Service (1917), 35 Cal.App. 630, 638 [170 P. 653, 657], and Fletcher v. Los Angeles Trust etc. Bank (1920), 182 Cal. 177, 182-184 [187 P. 425, 427, 428].
 One further quotation on the general subject of the adaptability of the common law to changed conditions will suffice, this from Mitchell v. State (1937), 179 Miss. 814, 824 [176 So. 743, 745, 121 A.L.R. 258]: "The common law, however, both in its substantive and in its adjective features, is not now, never has been, and never will be, static or stagnant. It has been one of the proudest boasts of the common law that it has within itself the potency of steady improvement, and this by judicial action, so long as that action is in accord with existing fundamental legal principles." See, also, Commonwealth v. Gallo (1931), 275 Mass. 320, 333 [175 N.E. 718, 724, 79 A.L.R. 1380].
 Turning from the general to the particular, we find ourselves confronted by California cases in which opportunities were presented, but not availed of, to adapt common law precepts to today's conditions. We refer to: Sesler v. Montgomery (1889), 78 Cal. 486 [21 P. 185, 12 Am.St.Rep. 76, 3 L.R.A. 653], where it was held that, because a man and wife are one person in the eyes of the common law, slander is not committed by the husband who makes a slanderous remark concerning a third person to his wife; People v. Miller (1889), 82 Cal. 107 [22 P. 934], and (with evident reluctance) People v. MacMullen (1933), 134 Cal.App. 81 [24 P.2d 794], in which it was held, for the same reason, that a man and wife cannot conspire; it takes two persons to commit that crime; and People v. Graff (1922), 59 Cal.App. 706 [211 P. 829], where the conclusion was reached that a wife may be guilty of embezzlement and forgery respecting her husband's effects, but the decision was placed not on the ground that the common law rule had changed, but on the ground that it had been changed, by statute. But on the other hand, we are told, in State of Hartman (1937), 21 Cal.App.2d 266, 269 [68 P.2d 744, 745], that "the common-law rule that regarded a husband and wife as a single entity and made the wife subject to the will of the husband" is a theory that "has long since been abandoned in [91 Cal.App.2d Supp. 949] this state, where the present policy of the law is to recognize the separate legal and civil existence of the wife."
 As is evident from the cases listed in the annotations found in 4 American Law Reports, pages 279 et seq., and 71 American Law Reports, pages 1123 et seq., in a majority of the states the common law presumption with which we are concerned is still applied. There is no controlling authority in this state, needless to say, and we find it more acceptable to follow those cases where effect is given to the change that has undoubtedly taken place in our controlling ideas. In Smith v. Meyers (1898), 54 Neb. 1 [74 N.W. 277, 278], we read: "Two instructions were requested by the defendant to the effect that the law so far presumes the wife to be under the control of the husband that, except for homicide and treason, she is conclusively presumed to commit any crime committed in his presence under compulsion by him, and that, therefore, she could not be convicted of perjury because of her testimony in this case, even if, in the language of the instruction, the action was 'a blackmailing scheme, and set- up job on the defendant.' The language quoted was so undignified, to use no harsher term, that the court was for that reason quite warranted in refusing to give it judicial sanction by incorporating it in its charge. But, beyond this, its object was to discredit the wife's testimony by stating that she was not subject to the penalties of perjury because of the presumed coercion of the husband. The general rule stated may have the sanction of age, and may have been justified by the social conditions of primitive times, when we are told that the husband might moderately chastise his wife, the only issue in such case being the size of the stick employed for such purpose. We do not care to inquire what real sanction it finds in adjudicated cases,--possibly no more than is found for the law of chastisement. Certain it is that such a presumption runs counter to our broad laws as to the competency of witnesses, and counter to the reason of men, in view of the domestic relations as they now exist, protected by more enlightened custom and a kindlier law. A wife is no longer a marionette, moved at will by the husband, either in fact or in law; and, with the legal recognition of a separate and responsible existence, she must assume some of the burdens of life,--among others, that of testifying to the truth, under the customary penalties."
 King v. City of Owensboro (1920), 187 Ky. 21 [218 S.W. 297, 298-9], contains this passage: "It may be conceded that even at the time of Blackstone it had been the rule of the [91 Cal.App.2d Supp. 950] common law for a thousand years that where a crime, with some exceptions, was committed by a married woman conjointly with or in the presence of her husband, prima facie she was not criminally liable, as it was presumed that she acted in obedience to his commands or under his coercion. ... While it is said that the reason for the rule is not quite clear, it is evident that it must have had its foundation in the peculiar relation which existed between husband and wife in the earlier days. At common law the husband had almost absolute control over the person of his wife; she was in a condition of complete dependence; could not contract in her own name; was bound to obey; she had no will and her legal existence was merged into that of her husband, so that they were termed and regarded as one in law, 'the husband being that one.' 13 R.C.L. p. 983; Elliott v. Waring, 5 T.B.Mon. 338, 17 Am.Dec. 69; MacKinley v. McGregor, 3 Whart. (Pa.) 369, 31 Am.Dec. 552. But these conditions have changed. Even at an early day courts of equity disregarded the fiction that husband and wife were one, and treated them as separate and distinct persons where it was necessary to protect the rights of the wife. Elliott v. Waring, supra; Winebrinner v. Weisiger, 3 T.B.Mon. 32. Indeed, the early rule that the husband might chastise his wife in moderation was never recognized or enforced in this state. ... Being secure in her person and property, and her separate identity having been established, it is clear that the means through which a husband exercised control and dominion over the person and property of his wife no longer exist. Having sought and obtained these new rights and privileges, which have placed her upon a plane of equality with her husband, she must accept the corresponding obligations and responsibilities which those rights and privileges entail, and can no longer take shelter under the supposed dominion of her husband. This is the view taken by the Supreme Court of Tennessee in the case of Morton v. State, 141 Tenn. 357, 209 S.W. 644, 4 A.L.R. 264, where it was held that the supposed duress of a woman by reason of marriage, which relieves her of liability for crimes committed in the presence of her husband, depends upon her disability by virtue of the marriage, and is destroyed by statutes emancipating her from such disability. We therefore conclude that there is no longer a presumption that a married woman who commits a crime conjointly with or in the presence of her husband acts under his coercion."
 Banfield v. Addington (1932), 104 Fla. 661 [140 So. 893, [91 Cal.App.2d Supp. 951] 898], speaks with a like voice: "At common law the husband had almost absolute control over the wife's person ... She was bound to obey her husband, was incapable of making contracts except for necessaries, so that in law they were regarded as but one person. ..."
 "But the foregoing view of the legal relationship of husband and wife is no longer warranted, when by modern conditions and through modern statutory provisions the wife has been emancipated with respect to her personal wages and earnings. Where the reason for a rule of common law, which is the spirit and soul of that law, fails, the rule itself fails. See Abraham v. Baldwin, 52 Fla. 151, 42 So. 591 [10 Ann.Cas. 1148], 10 L.R.A.N.S. 1051."
 We conclude, then, that the reign of the thousand year old presumption has come to an end. In our society, where almost no bride promises to obey her husband, and where it is not accepted as the usual that a wife does what her husband wishes by way of yielding obedience to a dominant will, the basis for the presumption has disappeared. A presumption that has lost its reason must be confined to a museum; it has no place in the administration of justice. If, therefore, a wife is to escape the consequences of her disobedience of a statute on the ground that she was acting in obedience to her husband, the fact is not established by the mere circumstances that her husband was present when she offended. The judgment and order appealed from are reversed; the case is remanded for a new trial.
 Shaw, P. J., and Stephens, J., concurred.