Harry TAYLOR, Peter A. Calus, James W. Brewster, William J. Langston and H. C. Greer, Plaintiffs-Appellants,

v.

L. B. FEE et al., Defendants-Appellees,

and

State of California, Intervening Defendant-Appellee.

No. 11573.

United States Court of Appeals Seventh Circuit.

April 23, 1956.

Rehearing Denied June 7, 1956.

Burke Williamson, Jack A. Williamson, Chicago, Ill., Adams Williamson & Turney, Chicago, Ill., of counsel, for appellants.

Edmund G. Brown, Atty. Gen., Herbert E. Wenig, Asst. Atty. Gen., for the State of California.

Kenneth F. Burgess, Edward M. White, Douglas F. Smith, Richard L. Selle, Chicago, Ill., Sidley, Austin, Burgess & Smith, Chicago, Ill., of counsel, for appellees L. B. Fee, H. W. Burtness, George H. Dugan, H. V. Bordwell and H. J. Reeser, Carrier Members of the First Division of the National Railroad Adjustment Board.

Before FINNEGAN, LINDLEY and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

This suit was brought in the district court to compel the First Division of the National Railroad Adjustment Board to take jurisdiction of and decide five claims filed there by plaintiffs.

Among the facts found by the district court [1] are those which we now state.

On September 1, 1942, the California Board of State Harbor Commissioners,[2] which operates the state-owned State Belt Railroad, entered into an agreement covering rates of pay and working conditions with two railroad unions—the Brotherhood of Locomotive Firemen and Enginemen and the Brotherhood of Railroad Trainmen. The five plaintiffs in this action were at all material times employees of State Belt and members of one or the other of the two brotherhoods.

At various times during the period beginning September 1, 1942 and the filing of this suit on January 14, 1953, the plaintiffs were employed as trainmen, engineer and pilot for the State Belt Railroad. Between April 6, 1949 and August 13, 1951, grievances on behalf of plaintiffs were filed with the First Division of the National Railroad Adjustment Board, which never acted upon them. The Adjustment Board was created by the Railway Labor Act, 45 U.S.C.A. § 151 et seq., to hear and make awards in " * * * disputes between an employee or group of employees and

1. 132 F.Supp. 356.

2. Herein sometimes referred to as the "Harbor Board".

a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions * * * ".[3] The Board, and each division thereof, is composed of equal numbers of representatives of the carriers and of the labor organizations.

Following a decision by the California Supreme Court, State of California v. Brotherhood of Railroad Trainmen, 37 Cal.2d 412, 232 P.2d 857,[4] the five carrier members of the First Division of the Adjustment Board declined to proceed, claiming that the Division was without jurisdiction due to the California court's ruling. Faced with an administrative deadlock in the Division, the plaintiffs filed this suit.

The attorney general of the United States filed an answer on behalf of the First Division, in which the allegations of plaintiffs' complaint were admitted and the plaintiffs' right to the relief prayed for was also acknowledged. The five carrier members of the First Division appeared by special counsel and resisted plaintiffs' claim to the relief sought. The state of California was permitted to intervene as a defendant.

The district court granted a motion of the state for summary judgment and entered a final judgment order dismissing the plaintiffs' complaint as to all defendants, from which this appeal was taken. The errors relied on arise out of conclusions of law made by the court. There is no contested issue of fact.

The State Belt Railroad is a common carrier engaged in interstate commerce. Its lines parallel the waterfront of San Francisco Harbor and serve some 45 wharves and 175 industrial plants. It has track or freightcar ferry connections with three interstate railroads. The State Belt Railroad is a vital link connecting various steamship terminals and adjacent industrial plants with three interstate carriers by railroad. The number of its employees varies between 125 and 225 persons, depending upon the volume of its business. State v. Brotherhoods, supra. In this court these facts are not disputed.

The Harbor Board operated the Railroad and applied the provisions of the collective agreement from September 1, 1942, to about November 13, 1951. The plaintiffs and the other enginemen and trainmen employees rendered services to the Harbor Board and received their pay under the September 1, 1942 agreement. During the period referred to, claims were filed by or on behalf of various employees with the National Railroad Adjustment Board, and awards were rendered on these claims.

Early in 1948 the state of California filed an action for declaratory judgment against the two brotherhoods in the Superior Court of the City and County of San Francisco. This action sought to have the September 1, 1942 agreement declared illegal, and was predicated upon two contentions: *first,* that, because the Railway Labor Act does not expressly apply to state-owned railroads, the operation of the State Belt Railroad is not subject to that act and the Harbor Board is not obliged to bargain collectively with the representatives of its employees for the purpose of establishing employees' rates of pay, rules and working conditions, and *secondly,* that the collective agreement of September 1, 1942 does not conform to the requirements of California statutory laws, because the rates of pay, which comprise article 1 of the agreement, were not submitted to the Department of Finance for its approval.

Section 1 of the statute upon which the state relies, as it existed when this contract was signed, being the act of September 15, 1935, § 675.1 of Political Code of California, reads as follows:

"Unless the Legislature specifically provides otherwise, whenever any State department, board, commission, court or officer fixes the salary or compensation of an employee or

---

3. 45 U.S.C.A. § 153 First (i).

4. For brevity sometimes referred to herein as "State v. Brotherhoods".

officer, which salary is payable out of State funds, the salary shall be subject to the approval of the State Department of Finance before it becomes effective and payable."

In 1943 (California Laws 1943, ch. 1016, § 1) slight changes in phraseology were made. They are not material here. In its present form § 675.1 is known as § 18004, Gov.Code of California.

The Superior Court entered judgment in favor of the defendant brotherhoods. This judgment was affirmed on appeal by the District Court of Appeals, First District, but the judgment was reversed by the California Supreme Court on June 20, 1951, 37 Cal.2d 412, 232 P.2d 857. Certiorari was denied by the United States Supreme Court. 342 U.S. 876, 72 S.Ct. 166, 96 L.Ed. 658.

1. The state of California takes the position that the decision of its highest court in State v. Brotherhoods, supra, determining that the Railway Labor Act is not applicable to the state, and that the contract of September 1, 1942 is invalid, is *res judicata* in this case, and that the district court was correct in so holding.

It is significant that plaintiffs in this case were not parties to State v. Brotherhoods. But, says the state of California, plaintiffs in this action "are in privity with the Brotherhoods who represented them before the California court and now represent them before the Adjustment Board". The state does not define the capacity in which it claims the brotherhoods represented plaintiffs. Certainly the record is devoid of any evidence of an express grant of authority. If the brotherhoods had an agency to represent the plaintiffs in that case, as far as the record before us shows, it could have been derived only from (a) the provisions of the federal Railway Labor Act, or (b) the bargaining agreement of September 1, 1942, or both.

(a) The Railway Labor Act,[5] in § 151, defines the term "employee" as used therein, as including "every person in the service of a carrier * * * who performs any work * * *." The same section also defines the term "representative" as meaning "any person or persons, labor union, organization, * * * designated either by a carrier * * * or by its or their employees, to act for it or them."

Section 152, after placing a duty upon all carriers and employees to exert every reasonable effort to make agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, provides that all disputes between a carrier and its employees shall be considered, and, if possible, decided in conference between representatives designated and authorized so to confer, respectively, by the carrier and the employees thereof interested in the dispute. It further provides that representatives, "*for the purposes of this chapter*, shall be designated by the respective parties * * *."[6] It also stipulates that employees shall have the right to organize and bargain collectively through representatives of their own choosing, and that in case of a dispute arising out of grievances, the designated representatives of the carrier and such employees, shall confer in respect to such dispute.

Section 153(i) provides that disputes growing out of grievances may be referred *by either party* to the appropriate division of the Adjustment Board. Section 153(j) states that the parties may be heard either *in person*, by counsel, or by other representatives, as they may respectively elect.

(b) We have examined the excerpts from the agreement of September 1, 1942 appearing in the record, and we find no authorization therein empowering the brotherhoods to represent the individual members in any court whatsoever, and counsel has not directed our attention to any part of the contract granting such authority. The record is silent as to this aspect of the case. Moreover, there is nothing in the record to indicate that the

---

5. 45 U.S.C.A. § 151 et seq.

6. Italics supplied by us.

brotherhoods purported to act in the state courts on behalf of the plaintiffs or any other employees.

We conclude that, insofar as plaintiffs' individual rights in asserting grievances before the National Railroad Adjustment Board and otherwise, are concerned, neither the Railway Labor Act nor the contract authorized the brotherhoods to represent plaintiffs in the state court action. The rights of plaintiffs to work under the contract were valuable personal rights which could not be affected or destroyed by a court decision in an action to which they were not parties and in which they did not appear either personally or by a duly authorized representative. While the brotherhoods were authorized by the Railway Labor Act to bargain for and execute the agreement of September 1, 1942 on behalf of the State Belt Railroad employees, including plaintiffs, and were also authorized to submit plaintiffs' grievance disputes to the National Railroad Adjustment Board (if plaintiffs so elected), all as provided in the act, their authority did not extend into the distinctly different field of representing plaintiffs in a court action where their individual rights as employees, under the contract, were being attacked.

It is clear from the reading of the act that the rights of employees are personal to them and distinct from the rights of the brotherhood and its members. This is recognized by the statutory provisions above cited to the effect that an employee's dispute may be *by him* referred to the Adjustment Board and that he may appear there *in person*, or by counsel or other representative, *as he may elect*. We are not here concerned with the rights which the brotherhoods themselves gained by the execution of the contract. We are concerned with the rights which the employees of State Belt Railroad obtained by the execution of that contract.

■ We, therefore, conclude that the holding in State v. Brotherhoods is not *res judicata* here as against plaintiffs.

■ 2. Untrammeled by the doctrine of *res judicata* and it being conceded that the State Belt Railroad is a common carrier engaged in interstate commerce, we hold that the congress has power to regulate it, pursuant to Art. 1, § 8, of the United States constitution, which provides:

"The Congress shall have Power * * * To regulate Commerce * * among the several States, * * *."

Pursuant thereto, congress enacted the Railway Labor Act,[7] the terms of which, it is contended by plaintiffs, apply to the State Belt Railroad although it is owned by a state.

When used in the Railway Labor Act, the term "carrier" "includes any * * * carrier by railroad, subject to the Interstate Commerce Act, * * *."[8] The Interstate Commerce Act[9] provides that it "shall apply to common carriers engaged in * * * The transportation of passengers or property wholly by railroad * * * from one State or Territory of the United States, or the District of Columbia, to any other State or Territory of the United States, or the District of Columbia * * *."

■ A railroad which lies wholly within one state is subject to the Interstate Commerce Act if it participates in the movement of persons and property from one state to another, United States v. Union Stock Yard & Transit Co., 226 U.S. 286, 33 S.Ct. 83, 57 L.Ed. 226; Dearing v. United States, 10 Cir., 167 F. 2d 310.

Whether the railroad is owned by a corporation or a political entity is not a part of the test of whether it is subject to the act. A functional test only is provided by the act. In City of New Orleans v. Texas & Pac. Ry. Co., 195 F.2d 887, at page 889, the court said:

"The Public Belt is a railroad, though owned by the City. So long as it engages in interstate and foreign commerce it is subject to the federal law and the Interstate Com-

---

7. 45 U.S.C.A. § 151 et seq.

8. 45 U.S.C.A. § 151, First.

9. 49 U.S.C.A. § 1.

merce Commission, like any other railroad."

In New Orleans Public Belt R. Comm. for City of New Orleans v. Ward, 5 Cir., 195 F.2d 829, the court, in considering the application of the Railway Labor Act to the Public Belt Railroad, expressly rejected the decision of the California Supreme Court in State v. Brotherhoods, supra, saying at page 831:

> "We do not think that the decision of the California Supreme Court on the coverage of the Railway Labor Act, 45 U.S.C.A. § 151 et seq., is consistent with one of the main designs of that act 'to avoid any interruption to commerce or to the operation of any carrier engaged therein' by requiring resort to the procedures it provides in the event of disputes 'before they reach acute stages that might be provocative of strikes.' Slocum v. Delaware, L. & W. R. Co., 339 U.S. 239, 242, 70 S. Ct. 577, 579, 94 L.Ed. 795. Nor does that decision accord full recognition to the broad definition of the term 'carrier' in the Railway Labor Act."

We said, in Chicago River & Indiana R. Co. v. Brotherhood of Railroad Trainmen, 7 Cir., 229 F.2d 926, at page 932, that the Railway Labor Act, as amended in 1934, "is directed to the needs of the railroad industry, employers and employees alike, having in mind the paramount interest of the public."

Sec. 1 of the Railway Labor Act [10] defines the term "carrier", as used in that act, in such broad terms as to include a railroad engaged in interstate commerce and owned by a state. The act contains no language exempting a state-owned railroad. In United States v. State of California, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567; the State Belt Railroad was held to be subject to the federal Safety Appliance Act.[11] In Maurice v. State of California, 43 Cal.App.2d 270, 110 P.2d 706, the same railroad was held to be subject to the federal Employers' Liability Act [12] and in State of California v. Anglim, 9 Cir., 129 F.2d 455, it was held to be subject to the federal Carriers Taxing Act.[13]

We, therefore, conclude that the Railway Labor Act is applicable to the State Belt Railroad in this case.

■ 3. By the same reasoning as set forth in point one hereof, we conclude that the concession made by the brotherhoods in State v. Brotherhoods, supra, to the effect that the contract which resulted from collective bargaining between the brotherhoods and the Harbor Board "has never been approved by the Department of Finance",[14] is not binding upon plaintiffs in this suit. There the California court had no occasion to, and did not, consider whether there had been an approval. Here that question is open for consideration.

■ Does this record show that the Department of Finance approved the contract of September 1, 1942? In determining that question we are bound by the law of California, which is the common law of England, so far as it is not repugnant to or inconsistent with the constitution of the United States or the constitution or laws of California. People v. Statley, 91 Cal.App.2d Supp. 943, 206 P.2d 76, at page 78, citing § 4468, Political Code of California. To the same effect are Victory Oil Co. v. Hancock Oil Co., 125 Cal.App.2d 222, 270 P.2d 604, at page 609, citing decisions of the California Supreme Court, in In re Elizalde's Estate, 182 Cal. 427, 432, 188 P. 560 and Estate of Apple, 66 Cal. 432, 434, 6 P. 7. If the constitution, statutes and court decisions of California furnish no rule by which to determine the question before us, we are required to determine it by resort, in that effort, to any authoritative court decisions enunciating the common law of England in this respect. Before doing so, however, we point out the

---

10. 45 U.S.C.A. § 151.

11. 45 U.S.C.A. § 1 et seq.

12. 45 U.S.C.A. § 51 et seq.

13. 45 U.S.C.A. § 261 et seq.

14. 232 P.2d 857, at page 859.

following material facts appearing in the record before us.

Early in 1942 the Harbor Board and representatives of the two brotherhoods entered into collective bargaining, which culminated in an agreement, effective September 1, 1942, establishing rates of pay for plaintiffs and other persons similarly employed by the Harbor Board and which also established rules of employment and working conditions for these employees. The Board operated the State Belt Railroad and applied the provisions of said agreement from September 1, 1942 and until on and after November 13, 1951,[15] during which time plaintiffs and other enginemen and trainmen employees rendered service to the Harbor Board and received their pay under said agreement. During that period, claims were filed by or on behalf of employees of the Harbor Board with the Adjustment Board and awards were rendered thereon.

The powers and duties of the Department of Finance are specified in California Governmental act, § 13290 et seq. Significant provisions thereof are, § 13294 that it *"shall* examine and expert the books of the several State agencies, at least once in each year, and as often as the director deems necessary."; § 13291, "may require from all such agencies of the State financial and statistical reports, duly verified, covering the period of each fiscal year."; and § 13293, "may examine all records, files, documents, accounts and all financial affairs of every agency mentioned in Section 13290."

The Harbor Board is a state agency of California. Its operation of the State Belt Railroad along the docks of one of the busiest and largest maritime ports in the world was as open and notorious as any business operation could possibly be. It was in, or at the doors of, the great city of San Francisco. The officials and employees constituting the Department of Finance of California necessarily were informed of and knew of its operation. They were bound to know that it belonged to the state of California. They were assumed to possess average intelligence and, therefore, to know that the enginemen and other employees engaged in operating that railroad were being paid by the Harbor Board which controlled and managed it. Those operating the Department of Finance had a statutory duty to examine the books of the Harbor Board at least once in each year, and had the right to examine all of its records, files, documents, accounts and all financial affairs, as well as the right to require from the Harbor Board financial and statistical reports, covering the period of each fiscal year.

Not only did the state pay the salaries provided for by the contract in question for a long period of time, but the plaintiffs and others were thereby induced to render the services required of them and, in order to lay an apparently legal basis for seniority rights, refrained from leaving the employment of the Harbor Board.

The foregoing undisputed circumstances support either of two conclusions. The first is that there was actually an approval of this contract contemporaneously with its execution in 1942 and that the subsequent events prove that fact. The second conclusion is that, even if there was no contemporaneous approval by the department, there was actually, from time to time as salaries were paid from state moneys, tacit approval of the contract under which they were paid.

It should be noted that § 18004 speaks of an approval by the State Department of Finance, but it does not state what form the approval must take.[16] However, we find from the recent case of

---

15. This is the date when the United States Supreme Court denied certiorari in State v. Brotherhoods.

16. In its brief in this court, the State of California sets forth in an appendix the majority opinion and dissenting opinion

in State v. Brotherhoods, 232 P.2d 857, 867. In dissenting, Justice Carter said that the majority opinion sets forth "the additional ground for invalidating the contract that it was not approved by the Department of Finance of the State.

Treu v. Kirkwood, 1954, 42 Cal.2d 602, 268 P.2d 482, at page 487, that the California Supreme Court, in construing this statute, has indicated that a tacit approval by the department may reasonably be inferred from circumstances. Not finding any other determination in the decisions of California as to the common law applicable to this situation, we turn elsewhere.

The United States Supreme Court in Bank of United States v. Dandridge, 12 Wheat. 64, 25 U.S. 64, 6 L.Ed. 552, enunciated the principles of the common law which we find applicable here. That was a suit brought by the bank on the official bond of its cashier. It became necessary for the bank to prove that its board of directors had approved the bond. Justice Story pointed out that it was conceded that no record of the approval of the bond existed. Applying the common law, he pointed out, 12 Wheat. 79, 6 L.Ed. 558, that the charter of the bank did not, in terms, require that such an approval should be by writing or entered of record. At page 82 of 12 Wheat., at page 559 of 6 L.Ed., he said:

"There may be, and undoubtedly there is, some convenience in the preservation of minutes of proceedings by agents; but their subsequent acts are often just as irresistible proof of the existence of prior dependent acts and votes, as if minutes were produced. If a board of directors were created to erect a bridge, or make a canal or turnpike, and they proceeded to do the service, and under their superintendence there were persons employed who executed the work, and the board proceeded to pay them therefor out of funds in their hands, these facts of public notoriety would be as irresistible evidence of the due execution of their authority, and of due contracts made, and proceedings had

by the board, as if the proceedings were recorded in the most formal and regular manner. * * * A board may accept a contract, or approve a security by vote, or by a tacit and implied assent. The vote or assent may be more difficult of proof by parol evidence than if it were reduced to writing. But surely this is not a sufficient reason for declaring that the vote or assent is inoperative. * * * All that the bank is interested in, is that there shall be an approval; and it matters not whether the fact is established by a direct record, or by acts of the directors, which recognize its prior existence."

█ Thus, in the case at bar the events, subsequent to the execution of the contract, including the payment of salaries periodically for several years by the Harbor Board to plaintiffs and other employees covered by that contract, openly and notoriously occurring under the supervisory eye of the Department of Finance, whose duty it was to scrutinize all of the fiscal operations of the Harbor Board, are convincing proof that it had approved the contract contemporaneously with its execution. Any other deduction from these undisputed facts would lead to a conclusion that that department had been guilty of an unprecedented and prolonged dereliction of duty or an abdication of the very functions for which it existed. In the absence of any evidence that the Department of Finance disapproved the contract, the evidence before us requires us to hold that the approval of the department, as required by § 18004, was given when the contract was executed.

█ Secondly, the same facts as hereinbefore set forth sustain the conclusion, which we also reach, that the payment of salaries from time to time over a period of several years, under the supervision of

* * *" He held that "There has been a substantial, although informal, approval by the state of the contract. It has been in force since 1942, and wages have been paid according to the rates provided

for therein since that time. The Department of Finance knew of such payments and gave implicit approval of them, * * *."

the Department of Finance, constituted its tacit, effective, legal approval of the contract in question.

While not necessary for the conclusions which we have just reached, we point out the inequity of any court at this time declaring the contract void to the detriment of the seniority rights of plaintiffs based upon service rendered by them under said contract. This case was brought in a court of equity and such result would be abhorrent to equitable principles.

■ Under the heading "Position of State of California on other issues", the state contends *inter alia* that, if the contract is valid and may be enforced, the authority of the Adjustment Board to decide the instant claims is precluded by the provision in the contract that a system board—the State Personnel Board—shall hear and decide these claims (citing 45 U.S.C.A. § 153, Second). In its brief herein the state makes no further reference to this contention ignoring it in its "summary of argument", "propositions of law relied on and citations of authorities" and in the body of its argument. (See rule 16 of this court referring to the contents of briefs.) No reference thereto was made in oral argument before this court. Under these circumstances we treat this contention as waived. For the same reason we consider as waived in this court the contentions of the state set forth in the footnote.[17]

Accordingly, the judgment order of the district court is reversed and this cause is remanded to that court with instructions to enter a decree granting to plaintiffs the relief for which they specifically pray in their complaint.

17. " \* \* \* (c) If the Railway Labor Act is held to be applicable to the State of California, then the Act is an unconstitutional interference with a state's relationship with its employees. (d) The contract is also invalid because the Harbor Board lacked authority to negotiate terms of the contract in conflict with the State Constitution and civil service laws. \* \* \* (f) If, nevertheless, the Adjustment Board does have jurisdiction over these claims the Board should not be required to render awards because such awards could not be enforced against the State of California in the Federal courts as the Railway Labor Act provides, because of the inhibition of the Eleventh Amendment of the United States Constitution."