[Civ. No. 6512. Third Appellate District.—February 28, 1941.]

THOMAS W. MAURICE, Respondent, v. THE STATE OF CALIFORNIA, Appellant.

Earl Warren, Attorney-General, and Lucas E. Kilkenny, Deputy Attorney-General, for Appellant.

Clifton Hildebrand, Charles McLeod, Goodman & Brownstone and Sheridan Downey, Jr., for Respondent.

TUTTLE, J.—This action was brought to recover damages for personal injuries received by respondent while in the employ of defendant. A trial was had before the court. Findings were made in favor of respondent, and judgment in the sum of $15,525 was entered. The appeal is from the judgment.

The complaint sets forth two causes of action. The first is based upon ordinary negligence, while the second is based upon negligence arising out of a failure of appellant to comply with the provisions of the Federal Employers' Liability Act (45 U. S. C. A., chap. II), Federal Safety Appliance Act (45 U. S. C. A., chap. I), and orders of the Interstate Commerce Commission promulgated thereunder. The facts alleged are substantially the same as those appearing in the summary which is given later.

The act first above mentioned is hereafter referred to as the "F.E.L.A.", while the second is referred to as the "F.S.A.A.". Under the former (section 51), an employee is entitled to recover from the railroad "for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or

by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, wharves, or other equipment.''

The second act (section 9), provides that ''whenever, as provided in this chapter, any train is operated with power or train brakes not less than fifty per centum of the cars in said train shall have their brakes used and operated by the engineer of the locomotive drawing such train . . . ''. The Interstate Commerce Commission is given power to increase the minimum percentage of cars to be operated by such brakes. This was done by an order raising the percentage to eighty-five per centum. A violation of the F. S. A. A. is negligence under the provision of F. E. L. A. (*San Antonio & A. P. Ry. Co.* v. *Wagner*, 241 U. S. 476 [36 Sup. Ct. 626, 60 L. Ed. 1110], affirming (Tex. Civ. App.) 166 S. W. 24). Such violation is negligence *per se*. (See numerous authorities under note 331, p. 213, 45 U. S. C. A.) It is an undisputed fact here that *less* than eight-five per centum of the cars in question were so equipped and operated as to comply with the terms of the F. S. A. A. We thus start with the premise that a cause of action for damages under the second count was made out against appellant, assuming that the court had jurisdiction and that the operation was a train movement.

The facts may be summarized as follows:

The State Belt Railroad is owned and operated by the State of California. It parallels the waterfront of San Francisco Harbor and extends onto some forty-five state owned wharves. It serves directly about one hundred and seventy-five industrial plants, has track connection with one interstate railroad, and, by wharf connections with freight car ferries, links that and three other interstate rail carriers with freight yards in San Francisco leased to them by the state. It receives and transports from the one to the other, by its own engines, all freight cars, loaded and empty, and the freight they contain, offered to it by railroads, steamship companies and industrial plants. The larger part of this traffic has its origin or destination in states other than California. For the transportation service it makes a flat charge per car. It issues no bills of lading and is not a party to through rates. It moves the cars on instructions contained in ''switch lists'' made out by the delivering or receiving carrier, which pays the charge and ab-

sorbs it in its rate. The charge on cars not delivered to or received from another carrier is paid by the industry concerned. The Belt Railroad is thus a terminal railroad for the industries and carriers with which it connects, and it serves as a link in the through transportation of interstate freight shipped to or from points in San Francisco over the connecting carriers. Its service is of a public character, for hire. Excepting for rare occasions when the Southern Pacific Railroad enters upon the Belt Line tracks for the purpose of spotting cars at the southern extremity of the Belt Line tracks, no other railroad ever brings its cars upon the tracks of the Belt Line Railroad; that throughout the extent of the Belt Line tracks the said tracks are crossed at many points by public highways carrying heavy vehicular traffic; that the said tracks are likewise crossed by heavy pedestrian traffic at many points on the said Belt Line system. North of the Ferry Building, at the foot of Market Street, and south of the Ferry Building are numbers of switching tracks upon and over which the Belt Railroad switches and delivers cars that it receives from other railroads. For approximately 2,000 feet along the frontage of the Ferry Building, the Belt Railroad consists of a single track, running in front of, and closely paralleling the Ferry Building. Operations north of the Ferry Building are under the control of a yardmaster, and all movements are made under his orders. Operations south of the Ferry Building are under the control of an assistant yardmaster, and he directs all operations south of the Ferry Building. Nominally his superior is the yardmaster; but as an operating practice, the assistant yardmaster controls the work done south of the Ferry Building. Switching engines located south of the Ferry Building handle the switching and make the movements required south of the Ferry Building. Switching engines north of the Ferry Building do the switching needed north of the Ferry Building, and make the required movements at that point. The Belt Line connection with the Southern Pacific is on the south side near Townsend Street. At or about 7:25 on every evening, cars which were ready for delivery to the Southern Pacific and which had been switched to the north of the Ferry Building, were assembled north of the Ferry Building. After these cars had been so assembled, and at or about 7:30, it was the uniform practice for a switch engine to take these

cars across and in front of the Ferry Building and down to the Southern Pacific transfer tracks at and around Townsend Street, south of the Ferry Building. When the cars are thus assembled they are known in railroad parlance as a "drag".

The accident happened on October 16, 1937. During the day various cars had been picked up by different engines from the various industries and piers north of the Ferry Building and connected to the Belt Railroad by switch tracks; these cars had been assembled in three separate cuts of cars, just north of the Ferry Building; and by a series of movements, these cars were finally assembled into one cut, the train consisting of forty-five cars. After these cars had been assembled it was the duty of the crew, of which respondent was a member, to take these cars across town and deliver them to the Southern Pacific transfer tracks. This particular drag, which ran every night, was known as the "Southern Pacific drag", or "the cross-town drag". While the Southern Pacific drag was being made up, it was found that the air connection on the twenty-eighth car from the engine of the drag, was broken, and that it was impossible, therefore, to connect up the air brakes on the rear seventeen cars, so that they could be controlled by the engineer from the engine. This fact was known to the members of the crew, and the car inspector, whose duty it was to inspect these cars. The testimony shows without dispute that in spite of the fact that the rear seventeen cars could not be connected up, the yardmaster and the foreman, nevertheless, ordered the drag to proceed as it was made up. The air was connected in the first twenty-eight cars behind the engine, but was not connected in the rear seventeen cars. It appears without dispute that it was the uniform custom and practice of the Belt Line to connect the air brakes on all cross-town drags and that the only reason the air brakes were not connected on this drag, was because of the defect in the twenty-eighth car. After the drag started up, respondent, who had been standing by the twenty-seventh car, walked to the rear of the drag, and, as was required by his duties, started to climb upon the rear ladder of the last car. As the locomotive proceeded in front of the Ferry Building, at a speed taken by the trial court in its opinion at five miles per hour, and estimated by the witnesses at from two to ten miles per

hour, a woman suddenly stepped out on the track with her back to the locomotive. The engine foreman, who was riding on the step of the locomotive, gave an emergency stop signal, the engineer applied the air brakes, and the engine came to an immediate stop. When the engine stopped, the application of the air brakes by the engineer set the brakes on the first twenty-eight cars. By reason of the fact that the brakes on the last seventeen cars were not operated by the engineer, as a result of the stopping, a very violent slack action took place. As the slack ran in, one of respondent's hands was torn loose from the ladder on the side of the rear car, and when it rebounded and ran out, the grip of his other hand was torn loose, and he was thrown to the ground between the forty-fourth and forty-fifth cars. The slack action dislocated his shoulder and he fell head first between the cars, falling a distance of approximately eight feet. As a result of the fall, his right knee cap was completely shattered.

 It is contended by appellant that the court erred in overruling the demurrer to the complaint, for the reason that there is no *general* liability on the part of the state for *negligence* of its officers and employees, and for the further reason that the state cannot be sued without its *express* consent. We are of the opinion that under the acts mentioned above, and the facts alleged, the state is liable, upon the theory that, by engaging in interstate commerce by rail, it has subjected itself to the commerce power of the federal government.

Respondent alleged and proved full compliance with the first paragraph of section 688 of the Political Code, which reads as follows:

"Anyone who has, or shall hereafter have, a claim on express contract or for negligence against the state must present the claim to the State Board of Control in accordance with the provisions of Section 667 of this Code. Should the claim not be allowed by the State Board of Control, the person having the claim is hereby authorized, subject to the conditions contained in this section, to bring suit against the state on such claim and to prosecute such suit to final judgment."

In the case of *United States* v. *California*, 297 U. S. 175, [56 Sup. Ct. 421, 80 L. Ed. 567], an action arising out of the collection of a penalty for failure upon the part of the

state to comply with F. S. A. A. in the operation of the rail-road *here* involved, it was definitely held that California, by engaging in interstate commerce by rail, subjected itself to the commerce power (Const. U. S., art. I, sec. 8), and was liable for a violation of the act last mentioned. The opinion states the question before the court, and disposes of it as follows:

"The State urges that it is not subject to the Federal Safety Appliance Act. It is not denied that the omission charged would be a violation if by a privately-owned rail carrier in interstate commerce. But it is said that as the state is operating the railroad without profit, for the purpose of facilitating the commerce of the port, and is using the net proceeds of operation for harbor improvement, see *Sherman* v. *United States*, 282 U. S. 25, 75 L. Ed. 143, 51 S. Ct. 41, *supra; Denning* v. *State*, 123 Cal. 316, 55 P. 1000, it is engaged in performing a public function in its sovereign capacity and for that reason cannot constitutionally be subjected to the provisions of the Federal Act. . . . The danger to be apprehended is as great and commerce may be equally impeded whether the defective appliance is used on a railroad which is state-owned or privately-owned. No convincing reason is advanced why interstate commerce and *persons* and property concerned in it should not receive the protection of the Act whenever a state, as well as a privately-owned carrier, brings itself within the sweep of the statute, or why its all-embracing language should not be deemed to afford that protection. . . . Respondent invokes the canon of construction that a sovereign is presumptively not intended to be bound by its own statute unless named in it. . . . We can perceive no reason for extending it so as to exempt a business carried on by a state from the otherwise applicable provisions of an Act of Congress, all-embracing in scope and national in its purpose, which is as capable of being obstructed by state as by individual action. Language and objective so plain are not to be thwarted by resort to a rule of construction whose purpose is but to resolve doubts, and whose application in the circumstances would be highly artificial."

Referring to the plenary power of the national government to regulate interstate commerce, the court says:

"The state can no more deny the power, if its exercise has been authorized by Congress, than can an individual."

It would be a strange situation, indeed, if the state could be held subject to the F. S. A. A. and liable for a violation thereof, and yet could not be sued without its express consent. The state, by engaging in interstate commerce, and thereby subjecting itself to the act, must be held to have waived any right it may have had arising out of the general rule that a sovereign state may not be sued without its consent. The last-mentioned case so holds, and is a complete answer to the contention. The demurrer was properly overruled.

The Safety Appliance Act provides that any "train" must be provided with a certain percentage of power brakes operated by the engineer of the locomotive. The word "train" is not defined in the statute. Appellant contends that it was not operating a *train* at the time of the accident, but was merely engaged in a *switching* operation. The trial court found that the movement of the cars was a regular train movement, and not a switching operation. It is contended by appellant that the evidence is insufficient to sustain that finding. There are numerous decisions upon this question in the federal courts. As stated in *Illinois Central R. R. Co.* v. *United States,* 14 Fed. (2d) 747,—"the decisions turn upon the particular facts of each case." And in *United States* v. *Chicago, B. & Q. R. R. Co.,* 237 U. S. 410 [35 Sup. Ct. 634, 59 L. Ed. 1023], it is said: "The controlling test of the statute's application lies in the general nature of the work done." The foregoing general rule should be borne in mind in disposing of this issue. We are also governed by the general rule that if there is any substantial evidence to support a finding of the trial court, we are not at liberty to set it aside, even though we may believe that there is more weight to the evidence adduced by the losing party.

Perhaps the most succinct definition of a train, within the purview of the F. S. A. A. is found in *United States* v. *Northern Pacific R. Co.,* 254 U. S. 251 [41 Sup. Ct. 101, 65 L. Ed. 249]. There, two strings of forty and forty-eight cars respectively were moved over a connecting switch track, for a distance of approximately four miles. The movement for approximately two, out of the four, miles was over a single connecting track; and the remainder of the movement was over switch tracks. The speed of the movement was from three to eight miles per hour. No cars were taken out or

set out on the trip and the movement was not a main line movement. *The company contended that this was a mere switching movement for the reason that no movement over a main line track was included.* The movement was not made under time table or train orders, but was made under the yardmaster's orders and no block signals were used. In holding that the movement was a train movement, subject to the provisions of the act, the Supreme Court said:

"*The company contended that the provision of the Safety Appliance Act did not control the operation because this terminal road was not part of a main line; that neither passenger nor freight trains, through or local, moved on it;* . . . It is admitted that this railroad is engaged in interstate commerce; and the cases cited show that transfer trains, like those here involved, are 'trains' within the meaning of the act. *A moving locomotive with cars attached is without the provision of the act only when it is not a train; as where the operation is that of switching, classifying, and assembling cars within railroad yards for the purpose of making up trains.*"

We are of the opinion that the evidence shows that this action does not come within the exception mentioned. The operation was not that of "switching, classifying, and assembling cars within railroad yards for the purpose of making up a train." These acts had all been performed. Forty-five cars, with locomotive attached, were on their way to be delivered to the Southern Pacific yards at the south end of the Belt Line Railroad, over a single track connecting the two switching areas of said line. There is nothing in F. S. A. A. which limits its application to operations on main line tracks. (So held in case last cited.) In the case of *Louisville & J. Bridge Co.* v. *United States,* 249 U. S. 534 [39 Sup. Ct. 355, 63 L. Ed. 757], an engine and twenty-six cars moved from the terminal of the Chicago & Ohio to the Illinois Central Company under the control of the defendant company, a terminal railroad. The movement was made over a zigzag course for a distance of 3,700 feet and a portion of the movement was over the main line tracks of the railroad companies. In holding that the movement was a train movement and not a mere switching movement, the court said:

"The work done with the cars, as described, *was not a sorting, or selecting, or classifying of them, involving coup-*

*ling and uncoupling, and the movement of one or a few at a time for short distances,* but was a transfer of the twenty-six cars as a unit from one terminal into that of another company for delivery, without uncoupling or switching out a single car, and it cannot, therefore, with propriety, be called a switching movement.''

In *Great Northern R. R. Co.* v. *United States,* 288 Fed. 190, C. C. A. 8, it is said:

''The mere fact that the Railroad Company designates a large stretch or tract as yard does not make every operation therein a switching operation''.

We have examined the cases relied upon by appellant. Several of them are discussed above. It is true that the factual structure in each of the cases we have mentioned is not *identical* with the one here, and a somewhat plausible attempt can be made to distinguish them upon such differences. We believe, however, that the fundamental principles to be adduced from such authorities lead to the conclusion that the evidence is sufficient to support the finding that the operation here was not a *switching* one, but a *train* movement within the meaning of the F. S. A. A. The finding, therefore, had sufficient evidentiary support.

It is contended by appellant that respondent assumed the risk of the injury. The trial court found otherwise, and we believe that there is sufficient evidence to support such finding. Respondent testified that when he complained to the yardmaster that the defective car was in the train, the latter told him to take the cars across just as they were. The rule of assumption of risk has no application when the employee is acting under the orders of his employer. (*Paulsen* v. *McDuffie,* 4 Cal. (2d) 111–117 [47 Pac. (2d) 709].)

Appellant pleaded contributory negligence as a defense to the action. While such defense might be set up with reference to the first cause of action, it is expressly provided in the F. E. L. A., section 53, that it is not a defense ''where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.''

Finally, it is contended that the state court had no jurisdiction. F. E. L. A. expressly provides:

''The jurisdiction of the courts of the United States under this chapter shall be concurrent with that of the courts of

the several states, and no case arising under this chapter and brought in any state court of competent jurisdiction shall be removed to any court of the United States.'' (45 U. S. C. A., sec. 56.)

The contention is without merit.

We do not deem it necessary to pass upon the question as to whether the judgment can be supported by findings based upon the first cause of action.

The record is free from error, and the findings have ample support. The judgment is therefore affirmed.

Thompson, J., and Pullen, P. J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 24, 1941.