## STATE OF CALIFORNIA v. ANGLIM,

### Collector of Internal Revenue.
### No. 9853.

Circuit Court of Appeals, Ninth Circuit.
April 20, 1942.

As Amended on Denial of Rehearing
June 8, 1942.

Earl Warren, Atty. Gen. of California, H. H. Linney, Lucas E. Kilkenny, and Adrian A. Kragen, Deputy Atty. Gen. of California, all of San Francisco, Cal., for appellant.

Samuel O. Clark, Jr., Asst. Atty. Gen., J. Louis Monarch, Alvin J. Rockwell, and Benjamin N. Brodsky, Sp. Assts. to Atty. Gen., all of Washington, D. C., and Frank J. Hennessy, U. S. Atty., and Esther B. Phillips, Asst. U. S. Atty., both of San Francisco, Cal., for appellee.

Before DENMAN, STEPHENS, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

This is an appeal from a judgment of the district court denying appellant, the State of California, a refund of employer excise taxes in the amount of $1,865.32 and similar employee taxes in the amount of $1,865.65, paid by it to appellee, Collector of Internal Revenue, under the Carriers' Taxing Act of 1937, c. 405, 50 Stats. 435, 45 U.S.C.A. §§ 261–273. The taxes were paid by the State Board of Harbor Commissioners which operated a railway hereafter described. For purposes of this opinion we assume such a tax is one on the state itself and that the state is entitled to sue for its recovery if illegally imposed.

The district court [37 F.Supp. 663, 667] overruled the state's contention that the Constitution gave the Congress no power to impose the tax on it, that court holding that the state's operation of its belt railway, hereinafter called the "Belt," carrying goods in interstate commerce along its docks and wharf frontage on San Francisco Bay, to and from other interstate carrier railways and ships, is not an "essentially and traditionally governmental function; that, in its operation of such line, the State is not immune from the payment of the federal excise tax imposed on it, nor are the employees of the Belt immune from the payment of the federal income tax imposed on them, by virtue of the provisions of the Carriers' Taxing Act of 1937."

The Belt is the railway of the state, held by the United States Supreme Court to be engaged in such interstate commerce and, whether or not the state is carrying merchandise thereon "in its 'sovereign' or in its 'private' capacity" under the power reserved to it by the Constitution, it is subject to the paramount power of Congress to regulate it as such carrier. United States v. State of California, 297 U.S. 175, 183, 184, 56 S.Ct. 421, 424, 80 L.Ed. 567. The regulation there sustained was a requirement that the trains be operated with the car coupling appliances required by the Safety Appliance Act, § 2, Act of March 2, 1893, c. 196, 27 Stat. 531, 45 U.S.C.A. § 2, and § 6 of the Act as amended April 1, 1896, 29 Stat. 85, 45 U.S.C.A. § 6.

The judgment imposed upon the funds of the state a statutory penalty of $100.00. The purpose of the penalizing statute was to compel the expenditure of the carrier's moneys in equipping its trains with the required couplers. That is to say, in no remote sense, as an alternative to the state's ceasing its railway operations, Congress could compel the expenditure of state funds for such physical equipment of its cars, if it owned or acquired such cars, as here it compels the state to pay funds to offset those paid by the Federal Government to its employees as pensions for their services to the state.

One of the questions presented by the appeal is whether this taxation of the state itself as employer and of the wages of the state's employees of the Belt, required to be withheld and paid over by the state, is a regulation of the Belt as an interstate carrier. Obviously, if it is, the Carriers' Taxing Act must be sustained under the principles established in United States v. State of California, supra, and in Board of Trustees of University of Illinois v. United States, 289 U.S. 48, 57, 58, 53 S.Ct. 509, 77 L.Ed. 1025, where the tariff on scientific apparatus imported by a state university was held a regulation of foreign commerce though it be regarded as imposed on the state.

■ The Railroad Retirement Act of 1937, Act of Congress of June 24, 1937, c. 382, 50 Stat. 307, 45 U.S.C.A. §§ 228a–228r, and the Carriers' Taxing Act of 1937, as shown by their legislative history, were companion bills enacted at about the same time and by their text and similarity of definitions indicate that it was the purpose of Congress by means of the Taxing Act to supply revenue which would reimburse the Treasury of the United States for expenditures made pursuant to the Retirement Act for the payment of retirement allowances to employees retired under the last named act. This is shown not only by the interlocking provisions of the two bills which were passed by the House in the same week, but by the unanimity of the statements of the chairmen of the two committees presenting the bills to the House, that they were "companion," the one to provide the revenue to make the expenditures for the other. Congressional Record, June 25, 1937, pp. 7922, 7928, 7931. Id. June 24, 1937, p. 8199.

■ The state argues that, even though the legislative history shows this the pur- pose of Congress, "it is clear that said act [Retirement Act] does not appropriate any money raised pursuant to its provisions for the payment of retirement pensions nor for any other specific purpose. Neither is any language used in the act showing that the revenues paid into the Treasury pursuant to its provisions are earmarked for any purpose. The most that can be said in this connection is that it is a possible inference from the legislative history of the Taxing Act that Congress was motivated to enact it in order to raise revenue to reimburse the Treasury for the outflow of funds which might thereafter be appropriated from any funds in the Treasury for the payment of pensions to employees retired under the Retirement Act."

We do not agree that, though the tax funds which the employer and employees added to the resources of the Nation to compensate for the draft made upon such resources by the pensions to be paid such employees, they are, nevertheless, to be deemed not raised for an interstate commerce purpose because they are not "earmarked" in the National Treasury for that purpose. It is enough that the outgo from the National Treasury for the pensions is to an equal extent expected by the Congress to be balanced by the inflow from the tax moneys of the benefitted employees and of their employer, presumably benefitted by the pensions paid them. Cf. Binns v. United States, 194 U.S. 486, 494, 24 S.Ct. 816, 48 L.Ed. 1087.

The state asks the question: "If the federal income tax by its terms levied a tax upon all of the income of the State of California, could such a tax be justified upon the ground that it is an act regulating interstate commerce because it appears from its legislative history that its enactment was motivated by the desire of Congress to add to the funds in the United States Treasury an amount substantially equal to the estimated amount required for the payment of retirement pensions awarded under the terms of the Railroad Retirement Act of 1937?"

The answer is obvious. The limited purpose of the tax shows that it could not absorb all of the state's income. If the payment of moneys for pensions to its employees in its interstate commerce enterprise is not compensated in the rates it charges for its switching services, and the state is required to make up the deficit, its amount would not so affect the state's to-

tal income that its functioning as a state would be substantially impaired. Cf. South Carolina v. United States and other cases of federal taxation of states considered hereafter.

■ The state makes no such showing of fact with reference to the effect of this railway pension portion of the companion acts, as that in the suit between the Railroad Retirement Board and the Alton Railroad Co., 295 U.S. 330, 55 S.Ct. 758, 79 L. Ed. 1468, concerning the earlier Railroad Retirement Act of 1934. That suit was between different parties and insofar as it rests on the facts offered in evidence is not res judicata of any matter in issue here. Indeed, the state does not contend that the Railroad Retirement Act of 1937 is unconstitutional.

■ In the absence of any evidence showing that its enforcement would violate any provision of the Constitution (Cf. Borden's Farm Products Co. v. Baldwin, 293 U.S. 194, 209, 55 S.Ct. 187, 79 L.Ed 281) its constitutionality cannot be successfully challenged, if, as held in an opinion of Mr. Justice Van Devanter in Lindsley v. National Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369, Ann. Cas.1912C, 160, "* * * any state of facts reasonably can be conceived that would sustain it, [because] the existence of that state of facts at the time the law was enacted must be assumed." Mr. Justice Sutherland states the rule in Adkins v. Children's Hospital, 261 U.S. 525, 544, 43 S. Ct. 394, 396, 67 L.Ed. 785, 24 A.L.R. 1238, "This court, by an unbroken line of decisions from Chief Justice Marshall to the present day, has steadily adhered to the rule that every possible presumption is in favor of the validity of an act of Congress until overcome beyond rational doubt."

■ We take judicial notice, based upon our present knowledge of the minds of workmen, that the following is a rational concept concerning interstate railway employees sufficient to sustain the Railroad Retirement Act of 1937 against the charge that it is unconstitutional because it would not effectually aid interstate commerce.

"That the men of our interstate railway system perform its major organic function of service to the public in transportation of its citizens and their merchandise. That

outside the personnel administering the state and federal governments their service is one of the most important to the material interest of the American people. That it is one of the last of the great employments in which the direction of mechanical forces of high power lies in the individual judgment of the worker. That this judgment is to be exercised both in the face of sudden emergency and with resistance to the dulling effect of sustained nerve-straining responsibility born in the monotony of years of repetition of the same task. That experience has shown that men's participancy in railroading produces a strong loyalty to the organization of which they are creative parts. That it is a loyalty of men of character devoted primarily to the service to which their minds and bodies are given; and that their loyalty to their employer *as employer* is subordinated to the loyalty to the organization as an all-embracing entity. That loyalty to the employer disappears once railroad men feel that he is not of them. That employee loyalty to the distant corporate president or banker-controlled board of directors is practically nonexistent. That one of the primary inducements *to draw men* of the required high character *into* such an organization and *keep them there* is the certainty that it, the living entity to which they belong, will afford them and their dependents a secure old age. That to a man of such required character, a pension giving such security has a stronger appeal to his loyalty to his service if it is a certain internal function of the organization, than if it rests in the uncertain and insecure largess of the employer. That the employers' power to suspend and discharge is a sufficient provision for the elimination of the inefficient and the incompetent; that the removal of the implement of the employer largess pension will tend to improve railway management, by aiding in eliminating an employing class which depends for the efficiency of its workmen on possible largess and the fear of its loss, instead of keeping alive the inspiration of loyalty to an organization of service."[1]

Certainly this is no mere "fanciful conjecture" such as is referred to by Mr. Chief Justice Hughes' opinion in Borden's Farm Products Co. v. Baldwin, supra, 293 U.S. page 209, 55 S.Ct. page 192, 79 L.Ed.

[1] Cf. "Comment on Trials of Fact in Constitutional Cases," American Bar Association Journal, December, 1935, pages 805–808.

281. Whether a differing rational concept may be possible is not the question. That which supports the legislation must prevail.

It is true that in Railroad Retirement Board v. Alton Railroad Co., supra, the majority of the court takes judicial notice that Congress in 1934 could not rationally conceive that the minds of railway workmen were so constituted that absence of fear of the loss of a railway job by lessened commerce or injury or old age could in any way add to the efficiency of their service. Morale, the court apparently thought, could be improved only if a pension were granted by the "largess" of the employer. Sufficient had then been generally disclosed of the railway workmen's motivations for the four dissenting Justices to disagree with the facts as found on judicial notice, by the majority.

■ However, the known facts determining whether an act is constitutional may vary from time to time. The same act at one time may be regarded as constitutional by facts judicially noted or other facts then shown, and at another time, on other known or proved facts, be held unconstitutional. It was so held in an opinion by Mr. Justice Holmes in Chastleton Corp. v. Sinclair, 264 U.S. 543, 548, 549, 44 S.Ct. 405, 68 L.Ed. 841, in determining the constitutionality of the rent regulating law for the District of Columbia.

■ Probably there never has been a period in modern legislative history when the concepts and motives of the minds of working men were more fully explored in the course of enacting or amending labor laws or in the discussion of unpassed labor bills, than in the three year period between the enactment of the first and third Railroad Retirement bills. Congress certainly could have a rational concept of the effect of a legislatively enforced railroad pension different in 1937 from that in 1934. To hold that it rationally could have had the concept we have stated above in 1937 concerning the later law, does not overrule the Alton case and does not violate stare decisis. Each decision rests on different facts—nonetheless facts whether judicially noticed or proved. Chastleton Corp. v. Sinclair, supra.

■ The Collector also contends that the Belt's operation is not essential to the continued existence of the state and hence is taxable. The state contends that such a function as operating a transportation system is not out of line with the traditional function of a state as conceived when the Constitution was adopted, and hence cannot be taxed. This is a question of fact and we believe it is properly resolved by the district court.

The contention of the state is answered by several decisions of the Supreme Court. In State of South Carolina v. United States, 199 U.S. 437, 26 S.Ct. 110, 50 L.Ed. 261, 4 Ann.Cas. 737, South Carolina, to diminish the crime and misery arising from the sale of intoxicating liquors in saloons, houses of prostitution, gambling houses, and the like, prohibited all liquor sales by private persons and undertook the regulation of the use of intoxicants by itself conducting the business. The control of the traffic in intoxicants has always been one of the more important public functions of the state. Nevertheless, the Supreme Court held that the state's intoxicating liquor business was subject to an excise tax, just as were private persons. In our opinion, the prevention of crime from the use of intoxicants is a function at least as essential to the continuance of the state, as such, as is its function of facilitating by regulation or self-operation the transport of merchandise.

In Helvering v. Powers, 293 U.S. 214, 227, 55 S.Ct. 171, 79 L.Ed. 291, the State of Massachusetts was operating a street railway through its state officers. The issue was presented whether the operation of such a railway was a state function immune from taxation. It was held, as in State of South Carolina v. United States, supra, that the function was subject to federal taxation and that therefore its officers managing the road were subject to a tax on their salaries or compensation for the services they so rendered the state. The court, at page 227 of 293 U.S., 55 S.Ct. 171, 79 L.Ed. 291, assumes the situation is as if the state itself were taxed as owner.

The last two cases are cited to support the decision in Allen v. Regents, 304 U.S. 439, 451, 452, 58 S.Ct. 980, 82 L.Ed. 1448, where was sustained federal taxation of the income derived from public athletic exercises and used for the support of the activities of the state institution. The tax for pensions to the state railway employees cannot be distinguished from those in these three cases.

If, as the state contends, these cases may seem to be overruled by the criteria stated in Brush v. Commissioner, 300 U.S. 352, 57 S.Ct. 495, 81 L.Ed. 691, 108 A.L.

R. 1428, the ruling there was confined to that particular tax by Helvering v. Gerhardt, 304 U.S. 405, 58 S.Ct. 969, 82 L.Ed. 1427. The Gerhardt case held that no immunity from federal taxation attached to the salary paid an employee of the Port of New York Authority, a bi-state agency engaged in the development of the New York harbor, performing functions, apart from the operation of a railroad, akin to those performed by the state. It is true that in that case the Supreme Court expressly left open the question whether the Port of New York Authority itself was subject to federal taxation, but it cannot be deemed to have cast any doubt upon State of South Carolina v. United States; Helvering v. Powers; Allen v. Regents, or United States v. State of California, supra.

The State of California is not entitled to recover its claimed refund and the judgment is affirmed.

Affirmed.

STEPHENS, Circuit Judge.
I concur in the result.