[S. F. No. 18003.   In Bank.   June 20, 1951.]

STATE OF CALIFORNIA, Plaintiff and Appellant, v. BROTHERHOOD OF RAILROAD TRAINMEN (an Unincorporated Association) et al., Respondents; DAVID T. LOCK, Intervener and Appellant.

Fred N. Howser, Attorney General, and Herbert E. Wenig, Deputy Attorney General, for Plaintiff and Appellant.

James H. Phillips for Intervener and Appellant.

Clifton Hildebrand for Respondents.

GIBSON, C. J.—The State of California brought this action for declaratory relief to determine the validity of a contract entered into by respondent brotherhoods and the Board of

State Harbor Commissioners respecting the rates of pay and working conditions of employees of the State Belt Railroad. This appeal was taken from a judgment in favor of respondents declaring the contract valid.

The Belt Railroad is owned and operated by the state, and its management and control are committed by statute to the Board of State Harbor Commissioners. (Harb. & Nav. Code, §§ 3150-3165.) The railroad parallels the waterfront of San Francisco harbor, extending to some 45 wharves and directly serving approximately 175 industrial plants, and it has track or freight-car ferry connections with three interstate railways. The Belt line facilitates the freight traffic of the harbor by moving freight cars between the various steamship companies, industrial plants and railroad carriers with which it has connections, and it serves as a link in the through transportation of interstate freight shipped to or from points in San Francisco over the connecting carriers. It is settled that the Belt Railroad is engaged in interstate commerce. (*United States* v. *State of California,* 297 U.S. 175 [56 S.Ct. 421, 80 L.Ed. 567]; *State of California* v. *Anglim,* 129 F.2d 455; *Maurice* v. *State of California,* 43 Cal.App.2d 270 [110 P.2d 706].)

The railroad employs between 125 and 225 persons, the number depending upon the volume of business. The Constitution of California provides that these employees are members of the state civil service, and under the Civil Service Act the appointment, classification, promotion, salary ranges, hours and general working conditions of all members of the civil service are governed by provisions of that act and by regulations of the State Personnel Board. (Cal. Const., art. XXIV, § 4; Gov. Code, §§ 18500-19765.) Compensation of employees within the ranges set by the State Personnel Board may be fixed by the Harbor Board (Harb. & Nav. Code, § 1705), subject to approval by the state Department of Finance. (Gov. Code, § 18004.)

On September 1, 1942, the Board of State Harbor Commissioners and respondent brotherhoods, representing the railroad employees, entered into the contract here involved. In general, the contract fixes matters relating to pay and working conditions which are normally governed by civil service statutes and regulations, and certain of its provisions conflict in substance with civil service laws on the subjects of promotions, lay-offs, leaves of absence, accumulation of sick leave and procedures for dismissal, demotion and suspension.

The contract was the result of collective bargaining between respondent brotherhoods and the Harbor Board, and the parties concede that it has never been approved by the Department of Finance.

The state contends that the contract is invalid because the employees affected are members of the state civil service and that their pay and working conditions are to be governed exclusively by legislation or administrative rules and not by collective bargaining contract. A similar contention is made by the intervenor, a Belt Railroad employee, who claims that his benefits and privileges are less under the provisions of the contract than under the state Civil Service Act, and that he is entitled to protection of the laws governing state employment. It is respondents' position, however, that the state, as owner of the Belt Railroad, is subject to the federal Railway Labor Act which secures to employees of railroads engaged in interstate commerce the right to enter into collective bargaining agreements with their employer concerning rates of pay, rules and working conditions. (45 U.S.C.A. §§ 151, 152.) Accordingly, respondents argue, the contract is valid and supersedes all provisions of the state Constitution, the Civil Service Act, and rules and regulations of the State Personnel Board which are inconsistent therewith.

The Railway Labor Act requires all common carriers by railroad, their officers, agents, and employees "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules and working conditions, and to settle all disputes, whether rising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce. . . ." (45 U.S.C.A. § 152.) It provides that employees shall have the right to organize and bargain collectively through representatives of their own choosing, and it sets up a procedure for the settlement of disputes by conference of representatives of employer and employees and, failing solution there, by reference to the National Railroad Adjustment Board, the National Mediation Board, or arbitration. (45 U.S.C.A. §§ 152-155, 157.) Orders of the National Railroad Adjustment Board may be enforced by action in United States District Courts, and judgment may be entered on awards which are the result of arbitration. (45 U.S.C.A. §§ 153p, 159.) The act fixes the procedure employers must follow in changing rates of pay, rules or working conditions, requiring thirty days' notice and conference with employee representatives; it further provides that no such changes shall be effective until

final action by the National Mediation Board, if the board offers its services or either party requests them. (45 U.S.C.A. § 156.) Punishment in the form of fines and imprisonment is prescribed for employers who fail to obey provisions of the act. (45 U.S.C.A. § 152 tenth.)

■ The Railway Labor Act does not expressly apply to state-owned railroads (45 U.S.C.A. § 151), and it is well settled that statutes which in general terms divest preexisting rights or privileges will not be applied to a sovereign, in the absence of express words to that effect, unless there are extraneous and affirmative reasons for believing that the sovereign was intended to be affected. (*United States* v. *United Mine Workers*, 330 U.S. 258, 272-273 [67 S.Ct. 677, 686, 706, 91 L.Ed. 884]; *United States* v. *Wittek*, 337 U.S. 346, 359 [69 S.Ct. 1108, 1115, 93 L.Ed. 1406]; *Parker* v. *Brown*, 317 U.S. 341, 350-351 [63 S.Ct. 307, 313, 87 L.Ed. 315]; *Balthasar* v. *Pacific Elec. Ry. Co.*, 187 Cal. 302, 305-306 [202 P. 37, 19 A.L.R. 452]; *cf. United States* v. *State of California*, 297 U.S. 175, 186 [56 S.Ct. 421, 425, 80 L.Ed. 567].) In *United States* v. *State of California, supra*, 297 U.S. 175 [56 S.Ct. 421, 80 L.Ed. 567], which also involved the Belt Railroad, the Supreme Court found reasons for believing that Congress intended to include states within the operation of the federal Safety Appliance Act. The court stated that the purpose of the statute there involved was to protect employees, the public and commerce from injury because of defective appliances on interstate carriers and that no convincing reason had been advanced why it should not apply to all carriers, whether private or state owned. The Belt Railroad has also been held subject to the federal Employers' Liability Act and the federal Carriers Taxing Act. (*Maurice* v. *State of California*, 43 Cal.App.2d 270 [110 P.2d 706]; *State of California* v. *Anglim*, 129 F.2d 455.) ■ However, considerations which may justify the application of general safety and taxing measures to state-owned carriers are not controlling in determining the intended scope of a statute which purports to regulate and supervise employer-employee relationships. ■ We must look to the subject matter of a particular statute and to the terms of the enactment in its total environment in order to determine legislative intent, and there are, we believe, affirmative reasons which indicate that Congress did not intend the Railway Labor Act to apply to state-owned carriers.

It is most significant that, while one of the major purposes of the Railway Labor Act is to secure the right of employees

to bargain collectively with their employer with respect to rates of pay, rules and working conditions, the terms and conditions of government employment are traditionally fixed by legislation and administrative regulation, not by contract. (See *Railway Mail Ass'n.* v. *Corsi,* 326 U.S. 88, 95 [65 S.Ct. 1483, 1488, 89 L.Ed. 2072]; *Nutter* v. *City of Santa Monica,* 74 Cal.App.2d 292, 298 [168 P.2d 741]; *City of Springfield* v. *Clouse,* 356 Mo. 1239 [206 S.W.2d 539, 542-544].) A concise statement of the characteristics distinguishing public from private employment in this regard appears in a letter from President Roosevelt to the National Federation of Federal Employees, dated August 16, 1937: "All Government employees should realize that the process of collective bargaining, as usually understood, cannot be transplanted into the public service. It has its distinct and insurmountable limitations when applied to public personnel management. The very nature and purposes of Government make it impossible for administrative officials to represent fully or to bind the employer in mutual discussions with Government employee organizations. The employer is the whole people, who speak by means of laws enacted by their representatives in Congress. Accordingly, administrative officials and employees alike are governed and guided, and in many instances restricted, by laws which establish policies, procedures, or rules in personnel matters." (Quoted in *City of Springfield* v. *Clouse,* 356 Mo. 1239 [206 S.W.2d 539, 542-543]; *C.I.O.* v. *City of Dallas,* (Tex.Civ.App.) 198 S.W.2d 143, 144-145.)

Recent authorities hold uniformly that the wages, hours and working conditions of government employees must be fixed by statute or ordinance and that state laws which, in general terms, secure the right of employees to enter into collective bargaining agreements with respect to those matters are not intended to apply to public employment.[1] (*Nutter* v. *City of Santa Monica,* 74 Cal.App.2d 292 [168 P.2d 741]; *City*

[1]It should be noted that we are not here concerned with the right of public employees to join or form labor organizations or to urge the proper exercise of discretionary authority by executive and administrative officers. (See *City of Springfield* v. *Clouse,* 356 Mo. 1239 [206 S.W.2d 539, 542-543]; *City of L. A.* v. *Los Angeles etc. Council,* 94 Cal.App.2d 36, 45 [210 P.2d 305]; 1 Teller, Labor Disputes and Collective Bargaining [1940 ed., 1947 Supp.] § 171, p. 113-119; Rhyne, Labor Unions and Municipal Employe Law [1946 ed.] § 1, p. 21-33; Rhyne, *id.,* Supp. Rep. [1949] § 1, p. 8-15; 54 Harv.L.Rev. 1360 [1941]; *cf. C.I.O.* v. *City of Dallas,* (Tex.Civ.App.) 198 S.W.2d 143, 145-147; *Seattle High School Chap. No. 200* v. *Sharples,* 159 Wash. 424 [293 P. 994, 72 A.L.R. 1215].)

*of Springfield* v. *Clouse,* 356 Mo. 1239 [206 S.W.2d 539, 545] ; *Miami Water Works Local No. 654* v. *City of Miami,* 157 Fla. 445 [26 So.2d 194, 195, 165 A.L.R. 967] ; see *Mugford* v. *Mayor and City Council of Baltimore,* 185 Md. 266 [44 A.2d 745, 746-747, 162 A.L.R. 1101] ; *Hagerman* v. *City of Dayton,* 147 Ohio 313 [71 N.E.2d 246, 253, 254] ; 1 Teller, Labor Disputes and Collective Bargaining [1940 ed., 1947 Supp.], § 171.) The Labor Relations Acts of several states expressly exclude public employees from their provisions relating to collective bargaining,[2] and it has been held that such discrimination does not constitute a violation of equal protection. (*Railway Mail Ass'n.* v. *Corsi,* 326 U.S. 88, 95 [65 S.Ct. 1483, 1488, 89 L.Ed. 2072].)

Congress itself has consistently excluded state employment from the operation of other labor relations statutes enacted under the commerce or war power. The National Labor Relations Act of 1937 and the subsequent Labor Management Relations Act of 1947, which secure the right of collective bargaining to employees of employers engaged in interstate commerce, expressly provide that the term employer as used in the acts does not include the United States or any state or political subdivision. (29 U.S.C.A. §§ 141, 152(2).) The Fair Labor Standards Act of 1938 likewise expressly excludes governmental employers from its provisions (29 U.S.C.A. §§ 201, 203d), as does the War Labor Disputes Act of 1943. (50 U.S.C.A. §§ 1501, 1502d.) These statutes indicate a uniform congressional policy that the relationship between a state and its employees is not to be controlled by the federal government even where those employees are engaged in interstate commerce, and so closely related in purpose is such labor legislation with the Railway Labor Act that the Supreme Court has characterized collective bargaining provisions of the Railway Act as the "analogue" of similar provisions in the National Labor Relations Act and has given parallel interpretation to sections of the two acts. (*National Labor Relations Board* v. *Jones & Laughlin S. Corp.,* 301 U.S. 1, 44-45 [57 S.Ct. 615, 627-628, 81 L.Ed. 893, 108 A.L.R. 1352].)

Under all the circumstances, it is obvious that application of the collective bargaining requirements of the Railway

[2]Fla., Stat.Ann., ch. 453, § 453.17; Mass., Ann. Laws, ch. 150 B § 2; Minn., Stat. Ann. ch. 179, § 179.01, subd. 3; N.Y., Consol. Laws, ch. 30, art. 20, § 715; Penn., Stat.Ann., title 43, § 211.3; R.I., Laws 1941, ch. 1066, § 16; Tex., 15 Civ.St., art. 5154c; Utah, Code Ann. 1943, 49-1-10(2) ; Wis., Stats. 1939, c. 57.

Labor Act to state employment would constitute an unprecedented interference with a state's traditional method of fixing the working conditions of its employees, and it seems doubtful that Congress had such an intent. ▮ As stated in *Parker v. Brown*, 317 U.S. 341, 351 [63 S.Ct. 307, 313, 87 L.Ed. 315], "In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress."

The legislative history of the act gives no indication that it was intended to affect any but private carriers. Prior to its enactment in 1926, Congress had passed a series of laws designed to bring about peaceful settlement of railroad disputes, but none had the full support of both the carriers and their employees, and arbitration machinery set up under provisions of the 1920 Transportation Act had proven particularly ineffective. (See 67 Cong. Rec. 4509-4513, 4516; *Virginian Ry. Co.* v. *System Federation No. 40*, 300 U.S. 515, 542 [57 S.Ct. 592, 597, 81 L.Ed. 789]; *Texas & N.O.R. Co.* v. *Brotherhood of Ry. & S.S. Clerks*, 281 U.S. 548, 562-563 [50 S.Ct. 427, 431, 74 L.Ed. 1034].) In 1925 representatives of some 58 major private railroads and 20 labor organizations met and entered into prolonged negotiations over legislation which would be satisfactory to all interests, and the Railway Labor Bill was the product of these conferences. (See 67 Cong. Rec. 4504-4505, 4522, 4524, 4583, 4652, 8807; *Texas & N.O.R. Co.* v. *Brotherhood of Ry. & S.S. Clerks, supra*, 281 U.S. 548, 563 [50 S.Ct. 427, 431, 74 L.Ed. 1034].) Identical bills embodying the proposals of the unions and the railroads were introduced in each House of Congress by the chairman of its committee on interstate commerce, and, after public hearings, the Railway Labor Bill was passed without substantial amendment. (See 67 Cong. Rec. 4504-4505; Chamberlain, The Railway Labor Act (1926) 12 A.B.A.Jour. 633.) Thus the Railway Labor Act basically represented the agreement of labor organizations with private carriers. We have been cited to no instance in the course of passage of the bill, and have discovered none, in which the question was raised as to whether state-owned railroads were intended to be affected.

Many of the purposes stated in the Railway Labor Act are similar to some of the purposes of the Norris-La Guardia Act which were discussed in *United States* v. *United Mine Workers*,

330 U.S. 258, 274 [67 S.Ct. 677, 687, 91 L.Ed. 884]. It was there held that the United States as an employer was not intended to be affected by statutes limiting the use of injunctions in labor disputes, and the opinion of the court, delivered by Chief Justice Vinson, states, ''The purpose of the [Norris-La Guardia] Act is said to be to contribute to the worker's full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives . . . for the purpose of collective bargaining. . . .'' The court then observed, ''These considerations, on their face, obviously do not apply to the government as an employer or to relations between the Government and its employees.'' In a separate concurring opinion Justices Black and Douglas added the following, ''Congress never in its history provided a program for fixing wages, hours, and working conditions of its employees by collective bargaining. Working conditions of Government employees had not been the subject of collective bargaining, nor been settled as a result of labor disputes. It would require specific congressional language to persuade us that Congress intended to embark upon such a novel program or to treat the Government employer-employee relationship as giving rise to a 'labor dispute' in the industrial sense.'' (330 U.S. at 328-329, 67 S.Ct. at 713.)

Those provisions of the Railway Labor Act which fix a method for the settlement of disputes by conference of employer and employee representatives, and, thereafter, by reference to federal adjustment or mediation boards or to arbitration, are equally inappropriate to the relationship between a state and its employees. Normally, a state provides methods for the settlement of disputes and grievances of its employees within the framework of its own government,[3] and a general Congressional provision for the handling of disputes between employers and employees would, we think, be intended to apply only to private individuals or corporations, and not to a sovereign state.

We can find no legitimate reason for making any distinction in the present case between governmental and pro-

[3]The California Civil Service Act provides for investigations or hearings by the State Personnel Board of disputes and other matters arising under the Civil Service Act and administrative rules. (Gov. Code, §§ 18670-18681, 18714, 18803, 18851, 19578-19587, 19541, 19576, 19583.5.)

prietary functions of the state. The fact that operation of the Belt Railroad may be described as a proprietary activity (see *People* v. *Superior Court*, 29 Cal.2d 754, 763 [178 P.2d 1]) is immaterial in considering the characteristics of public employment or the intended scope of congressional legislation regulating interstate commerce. (*United States* v. *State of California*, 297 U.S. 175, 183 [56 S.Ct. 421, 424, 80 L.Ed. 567]; *City of L. A.* v. *Los Angeles etc. Council*, 94 Cal.App.2d 36, 45-46 [210 P.2d 305]; *Nutter* v. *City of Santa Monica*, 74 Cal.App.2d 292, 302 [168 P.2d 741]; see Rhyne, Labor Unions and Municipal Employe Law [1946 ed.] § 7, p. 53-56; Rhyne, *id.*, Supp.Rep. [1949] § 7, p. 31-32; 1 Teller, Labor Disputes and Collective Bargaining [1940 ed., 1947 Supp.] § 171, pp. 117, 118.)

In view of our conclusion that Congress did not intend the Railway Labor Act to apply to state-owned and operated carriers, we need not consider whether Congress could constitutionally undertake to regulate the relationship between a state and its employees, and we likewise need not determine whether application to a state of provisions for enforcement of orders of the Railroad Adjustment Board and arbitration awards in federal courts would constitute a violation of the Eleventh Amendment to the federal Constitution.

The judgment in the present case must be reversed for the further reason that, assuming the state is subject to the Railway Labor Act and that state civil service regulations are superseded by provisions of that act, the Harbor Board could not properly enter into the contract with the brotherhoods and bind the state without the approval of the Department of Finance, as required by section 18004 of the Government Code.[4] There is no inconsistency between section 18004 and the provision in section 1705 of the Harbors and Navigation Code authorizing the Board of State Harbor Commissioners to fix the salary of its employees.[5] The

---

[4]Section 18004 provides: ''Unless the Legislature specifically provides that approval of the Department of Finance is not required, whenever any State agency or court fixes the salary or compensation of an employee or officer, which salary is payable in whole or in part out of State funds, the salary is subject to the approval of the Department of Finance before it becomes effective and payable.'' (As added in 1945, based on former Pol. Code, § 675.1.)

[5]Section 1705 provides, ''. . . The Board shall fix the compensation of its officers and employees other than the commissioners. . . .'' (As amended in 1945.) Prior to 1945 the section read as follows: ''. . . The salaries of [certain specified officers] shall be fixed by the board with the approval of the Director of Finance. The board shall fix the compensation of other employees. . . .''

Department of Finance is given general powers of supervision over all matters concerning the financial and business policies of the state. (Gov. Code, § 13070, based on former Pol. Code, § 654.) The purpose of such legislation is to conserve the financial interests of the state, to prevent improvidence, and to control the expenditure of state money by any of the several departments of the state. (*Ireland* v. *Riley*, 11 Cal.App.2d 70, 72 [52 P.2d 1021].) ■■■ Since sections 18004 and 1705 may be harmonized, they should be construed together and with reference to the whole system of which they form a part. (See *Cohn* v. *Isensee*, 45 Cal.App. 531, 536-537 [188 P. 279]; *Ireland* v. *Riley, supra*, 11 Cal.App.2d 70, 74-76 [52 P.2d 1021]; *Chilson* v. *Jerome*, 102 Cal.App. 635, 641 [283 P. 862].) ■■■ Moreover, even if we were to accept the argument that the requirement of approval of salaries by the Department of Finance is tantamount to transferring to the department the power to ''fix'' compensation of Harbor Board employees, the legislative intent to create supervisory powers in the department is so clear and unmistakable that section 18004 must be regarded as modifying all earlier legislation authorizing specific state agencies to fix the salaries of their employees.

The judgment is reversed.

Shenk, J., Edmonds, J., Traynor, J., Schauer, J., and Spence, J., concurred.

CARTER, J.—I dissent.

The majority opinion holds that employees of the state engaged in the operation of the State Belt Railroad, a state operated carrier engaged in interstate commerce, do not have the protection afforded by federal Railway Labor Act. (45 U.S.C.A. §§ 151-152.) Under that act working conditions and rates of pay are fixed by a collective bargaining agreement between the employer and the union representing the employees. The majority holds that it was not intended by Congress to include the state as a carrier-employer; that the employees are subject to the state civil service laws, and that the Board of Harbor Commissioners are authorized to fix the salary of such employees with the approval of the Director of Finance. That result is reached on the following bases: (1) The rule of statutory construction that a statute does not apply to the government unless it is named; (2) The rates

of pay and working conditions of public employees are traditionally fixed by statute and administrative regulation and must be so established; (3) Congress has "consistently" excluded the state from labor laws; (4) The history of the act. None of those grounds is valid and the conclusion is squarely contrary to the previous determinations on the subject.

In *United States* v. *State of California*, 297 U.S. 175 [56 S.Ct. 421, 80 L.Ed. 567], the *same* Belt Railroad was involved and the court was concerned with the federal Safety Appliance Act. (45 U.S.C.A. § 1, et seq.) That act has to do with standards of safety in train equipment. The particular problem presented was whether California was subject to the *penal* provision of the act for failing to comply with the safety standard. The court held that it was, and in so holding, stated principles which make it a binding precedent in the instant case. It found that the Belt Line is engaged in interstate commerce. A unanimous court said: "The state urges that it is not subject to the federal Safety Appliance Act . . . it is said that as the state is operating the railroad without profit, for the purpose of facilitating the commerce of the port, and is using the net proceeds of operation for harbor improvement, . . . it is engaged in performing a public function in its sovereign capacity and for that reason cannot constitutionally be subjected to the provisions of the federal Act. In any case *it is argued that the statute is not to be construed as applying to the state acting in that capacity.*

". . . The only question we need consider is whether the exercise of that power, in whatever capacity, must be in subordination to the power to regulate interstate commerce, which has been granted specifically to the national government. *The sovereign power of the states is necessarily diminished to the extent of the grants of power to the federal government in the Constitution. . . .*

"California, by engaging in interstate commerce by rail, has subjected itself to the commerce power, and is liable for a violation of the Safety Appliance Act, as are other carriers, unless the statute is to be deemed inapplicable to state-owned railroads because it does not specifically mention them. The federal Safety Appliance Act is remedial, to protect employees and the public from injury because of defective railway appliances, . . . and to *safeguard interstate commerce itself from obstruction* and injury due to defective appliances upon locomotives and cars used on the highways of interstate com-

merce, even though their individual use is wholly intrastate. . . .

"In *Ohio* v. *Helvering, supra,* [292 U.S. 360 (54 S.Ct. 725, 78 L.Ed. 1307)], it was held that a state, upon engaging in the business, became subject to a federal statute imposing a tax on those dealing in intoxicating liquors, although states were not specifically mentioned in the statute. The same conclusion was reached in *South Carolina* v. *United States, supra* [199 U.S. 437 (26 S.Ct. 110, 50 L.Ed. 261, 4 Ann.Cas. 739)]; and see *Helvering* v. *Powers, supra,* [293 U.S. 214 (55 S.Ct. 171, 79 L.Ed. 291)]. Similarly the Interstate Commerce Commission has regarded this and other state-owned interstate rail carriers as subject to its jurisdiction, although the Interstate Commerce Act does not in terms apply to state-owned rail carriers. . . .

"Respondent invokes the canon of construction that a sovereign is presumptively not intended to be bound by its own statute unless named in it, . . . The presumption is an aid to consistent construction of statutes of the enacting sovereign when their purpose is in doubt, but it does not require that the aim of a statute fairly to be inferred be disregarded because not explicitly stated. . . . *We can perceive no reason for extending it so as to exempt a business carried on by a state from the otherwise applicable provisions of an act of Congress, all-embracing in scope and national in its purpose,* which is as capable of being obstructed by state as by individual action. Language and objectives so plain are not to be thwarted by resort to a rule of construction whose purpose is but to resolve doubts, and whose application in the circumstances would be highly artificial. It was disregarded in *Ohio* v. *Helvering, supra,* and *South Carolina* v. *United States, supra.* See *Heiner* v. *Colonial Trust Co.,* 275 U.S. 232, 234, 235 [48 S.Ct. 65, 72 L.Ed. 256]." (Italics added.)

The foregoing is precisely pertinent in the instant case. The purpose of the Railway Labor Act, like the Safety Appliance Act, is to safeguard commerce from obstruction. (45 U.S.C.A. § 151a; *Slocum* v. *Delaware L. & W. R. Co.,* 339 U.S. 239 [70 S.Ct. 577, 94 L.Ed. 795].) The purpose being the same the application of the acts should be the same. To achieve that purpose Congress has provided means of assuring peaceable labor relations which are clearly applicable when the state is a carrier. It has declared the policy that the purpose may be attained by collective bargaining and the

mediation board rather than the State Personnel Board. If by federal mandate the state must keep its inanimate equipment safe, it must also deal with its employees according to the manner set forth in the Labor Act—a federal mandate.

It has been held that the state is subject to the federal Carriers' Taxing Act in operating the Belt Line, which act is for the purpose of raising revenue to pay for *retirement of railroad employees*; that the federal statutory right to receive retirement pay is binding upon the state. In *State of California* v. *Anglim*, 129 F.2d 455, that issue was presented. There is no possible basis to distinguish that case from the one at bar and the majority opinion makes no attempt to do so. If payment of retirement to state employees of a state carrier is controlled by the federal law although the state is not named in the statute, certainly federal statutory provisions for collective bargaining which embrace wages and working conditions are binding on the state. Retirement or pension payments have always been considered as deferred compensation or wages. Moreover, under the majority holding an anomalous situation is created. The payment of wages before retirement would be controlled by state law while subsequent wages (pension payments) would not. The analogy between the cases compels the same result. Hence the majority opinion violates the fundamental rule that a state court is bound by the construction of a federal statute by a federal court. (*Stoll* v. *Gottlieb*, 305 U.S. 165 [59 S.Ct. 134, 83 L.Ed. 104].)

In discussing a federal statute requiring consent of Congress for the construction of a dam on navigable streams, the court said in *United States* v. *Arizona*, 295 U.S. 174, 184 [55 S.Ct. 666, 79 L.Ed. 1371]: "These provisions unmistakably disclose definite intention on the part of Congress effectively to safeguard rivers and other navigable waters against the unauthorized erection therein of dams or other structures for any purpose whatsoever. The plaintiff maintains that the restrictions so imposed apply *only to work undertaken by private parties*. But no such intention is expressed, and we are of opinion that none is implied. The measures adopted for the enforcement of the prescribed rule are in general terms and purport to be applicable to all. No valid reason has been or can be suggested why they should apply to private persons and not to federal and *state officers*." (Italics added.)

In *State of California* v. *United States*, 320 U.S. 577 [64

S.Ct. 352, 88 L.Ed. 322], the court held that the United States Maritime Commission could regulate the rates of the Oakland city harbor, and in answer to the claim that the Congressional Act did not apply to the city, stated that the issue was no longer open at this late date, citing *United States* v. *State of California, supra,* 297 U.S. 175. Certainly what the city shall charge is as much a matter peculiarly within its power as the relations with its employees.

It has been held that the Federal Employers' Liability Act which provides for the recovery of damages by railroad employees for injuries suffered in the course of their employment, applies to the Belt Line here involved. *Maurice* v. *State of California,* 43 Cal.App.2d 270 [110 P.2d 706].) No attempt is made to distinguish that case and it cannot be done. The act in question deals with the rights and duties as between employer and employee the same as the Railway Labor Act.

Finally, the identical question here presented has been decided. In *National Council, etc. Union* v. *Sealy,* 56 F.Supp. 720, the court dealt with whether patrolmen, hired by the city to patrol the harbor where the city operated a carrier, were subject to the Railway Labor Act. The court held they were not because they were not employees of the city as a carrier, but said, citing the cases heretofore discussed: ''Most of the cases cited by Plaintiffs throw some light on the question of coverage, but are not controlling. *United States* v. *State of California,* 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567; *State of California* v. *Latimer,* 305 U.S. 257, 59 S.Ct. 166, 83 L.Ed. 159, and *State of California* v. *Anglim,* 9 Cir., 129 F.2d 455 of course, *settle it that a railroad, etc., owned by the State or as here by a City which is an agency of the State is, under certain circumstances* and perhaps generally speaking, within the coverage of the [Railway Labor] Act.'' (Italics added.) That case was affirmed on appeal (152 F.2d 500), the court not discussing the instant point but deciding that whether the patrolmen were under the act must be decided by the Interstate Commerce Commission. It should be noted that there had been no determination here by that commission.

As above seen, we have three unqualified instances in which *federal* statutes dealing with the relationship between the *employer and employee in the railroad field* have been held to be applicable to the state with reference to the *same* Belt Line Railroad. Yet, in face of this wealth of authority,

the majority advances nebulous and negative grounds for concluding that the Railway Labor Act, which deals with the *same* relationship in the *same* field does not apply. No effort is made to distinguish those cases.

The first ground advanced is that a statute does not apply to the government unless it so states. That proposition as presently involved was disposed of in *United States* v. *State of California, supra, Maurice* v. *State of California, supra,* and *State of California* v. *Anglim, supra.* The act itself (Railway Labor Act) is comprehensive and inclusive. It must be liberally construed (*Nashville C. & St. L. Ry.* v. *Railway Employees' Dept. of A. F. of L.,* 93 F.2d 340, cert. den., 303 U.S. 649 [58 S.Ct. 746, 82 L.Ed. 1110]), and it has been held that it applies to the receiver of a railroad (*Burke* v. *Morphy,* 109 F.2d 572), although the receiver is subject to the control of the appointing court.

The second argument of the majority that rates of pay and working conditions of public employees are traditionally a matter of state statutory and administrative regulation does not shed any light on the subject. That argument applies with equal force to rights arising under provisions for retirement, for injuries in the course of employment, and the safety requirements. They are no less traditionally regulated, as to public employees, by statute and administrative regulation. Nevertheless the cases hold, as above shown, that the federal railroad laws control because of their effect upon interstate commerce.

That Congress has "consistently" excluded the state from labor laws—the third ground—is equally untenable. If that is true, then it supports my position, for Congress thought it must use language excluding the state when it desired to do so, and it did. But it did not employ such language in the Railway Labor Act and in the field of employer-employee relations in the railroad industry, and the courts have consistently held that the federal legislation includes the state.

In speaking of the history of the act—the fourth ground—the majority approach is wholly negative. It is said that it gives no indication that the state as a carrier was to be included. But it gives no indication to the contrary. True, the act probably arose out of cooperation between the unions and private carriers, but no doubt the other federal railroad laws were similarly initiated.

The majority opinion sets forth the additional ground for invalidating the contract that it was not approved by the

Department of Finance of the State. There has been a substantial, although informal, approval by the state of the contract. It has been in force since 1942, and wages have been paid according to the rates provided for therein since that time. The Department of Finance knew of such payments and gave implicit approval of them, for it "may require from all such agencies of the State, financial and statistical reports, duly verified, covering the period of each fiscal year." (Gov. Code, § 13291.) And "may examine all records, files, documents, accounts and all financial affairs of every agency mentioned in Section 13290." (Gov. Code, § 13293.) And it "*shall* examine and expert the books of the several State agencies, at least once in each year, and as often as the director deems necessary." (Gov. Code, § 13294.) Hence it has examined the books and records of the Harbor Board, which would include the collective bargaining contract and the payments to employees and has found them proper.

It is apparent that the last mentioned issue should not be so lightly brushed aside. The majority holds that the Harbor Board has the right to fix the pay of the employees subject to the approval of the Department of Finance and also that such employees are under civil service. If they are under civil service it is very doubtful that the Legislature may provide that their rate of pay be fixed by the Harbor Board or be subject to the approval of the Department of Finance. The rates of pay certainly relate to civil service for the Personnel Board is empowered by statute to fix the rate of pay. (Gov. Code, §§ 18500(1)(6), 18850 et seq.) The Constitution vests civil service matters exclusively in the State Personnel Board. "Said board shall administer and enforce, and is vested with all of the powers, duties, purposes, functions, and jurisdiction which are now or hereafter may be vested in any other State officer or agency under, Chapter 590 of the California Statutes of 1913 as amended or any and all other laws relating to the State civil service as said laws may now exist or may hereafter be enacted, amended or repealed by the Legislature." (Cal. Const., art. XXIV, § 3(a).)

Irreconcilable conflicts in state and federal law will necessarily result from the holding of the majority in this case. Under its holding, State Belt Railroad employees are under civil service, but their salary must be fixed by the Harbor Board with the approval of the Department of Finance. This holding is in conflict with both the Constitution of California and the Government Code (see Cal. Const., art XXIV, § 3(a)

and Gov. Code, § 20000 et seq.) which provide that the qualifications, rates of pay, dismissals and the like are all within the jurisdiction of the State Personnel Board, and that there is a state retirement system which embraces all civil service employees. All such employees automatically become members of the retirement system (Gov. Code, § 20303), and, therefore, must contribute to it (*id.* 20600, et seq.). Hence, if, as is held by the majority, the instant employees are civil service employees, they must be members of the state retirement system and contribute to it, but the majority opinion concedes that they are subject to the federal Railroad Employees' Retirement Act (see *State of California* v. *Anglim,* 129 F.2d 455). There is no basis for splitting the complete system of employer-employee relations between the state and its employees into parts, some of which are controlled by state law and others by federal law. The majority holding leads to absurd results. This would be avoided by a holding that *all* of the federal statutes relating to railroad employer-employee relations apply to State Belt Railroad employees. The trial court and the District Court of Appeal so held in this case (*State of California* v. *Brotherhood of Railroad Trainmen,* (Cal.App.) 222 P.2d 27). That holding is eminently sound.

I would, therefore, affirm the judgment.

The opinion was modified to read as above printed and respondents' petition for a rehearing was denied July 19, 1951. Carter, J., voted for a rehearing.